**JET COURIER SERVICES, INC., PDQ Air Services, Inc., Dixie Airways, Inc., Plaintiffs-Appellants,**

v.

**FEDERAL RESERVE BANK OF ATLANTA, et al., Defendants-Appellees.**

No. 83–3128.

United States Court of Appeals, Sixth Circuit.

Argued May 24, 1983.

Decided July 29, 1983.

Glenn V. Whitaker (LC), Graydon, Head & Ritchey, Cincinnati, Ohio, Daniel B. Silver (argued), Lee C. Buchheit, Vincent Alventosa, Eric C. Jeffrey, Cleary, Gottlied, Steen & Hamilton, Washington, D.C., for plaintiffs-appellants.

Christopher K. Barnes, U.S. Atty., Donetta D. Wiethe, Asst. U.S. Atty., James F. McDaniel, Cincinnati, Ohio, Mark Rutzick (argued), Federal Programs Branch, Civ. Div., Washington, D.C., for defendants-appellees.

Before LIVELY and CONTIE, Circuit Judges, and SILER, District Judge.*

LIVELY, Circuit Judge.

In this action three private air couriers sought to enjoin the Board of Governors of the Federal Reserve System (the Board) and the twelve regional Federal Reserve Banks from implementing an order which modified their check collection services. The program sought to be enjoined extended the time for presentment of checks and established a schedule of fees to be charged by Federal Reserve Banks for check collection services. The district court dismissed the action and this court granted an expedited appeal.

I.

For many years prior to 1980 the Federal Reserve Banks performed check collection services for member banks without charge. The earnings on reserves which member banks were required to maintain on deposit with the Federal Reserve Banks made this free service possible. As part of a general overhaul of the government's regulation of the banking industry Congress enacted the Monetary Control Act of 1980, Pub.L. 96–221, 94 Stat. 132 (The MCA). One feature

* The Honorable Eugene Siler, Judge, U.S. District Courts for the Eastern and Western Districts of Kentucky, sitting by designation.

of the MCA is a provision by which many banks in the United States that are not now members will eventually be required to maintain reserve accounts with the Federal Reserve System. Further, services such as check clearing formerly provided to member banks only will be made available to all banks, regardless of whether or not they are members. The services will no longer be free of charge, however. Section 107 of the MCA added a new Section 11A to the Federal Reserve Act, codified as 12 U.S.C. § 248a (1976 ed., Supp. IV):

### § 248a. Pricing of services

**(a) Publication of pricing principles and proposed schedule of fees; effective date of schedule of fees**

Not later than the first day of the sixth month after March 31, 1980; the Board shall publish for public comment a set of pricing principles in accordance with this section and a proposed schedule of fees based upon those principles for Federal Reserve bank services to depository institutions, and not later than the first day of the eighteenth month after March 31, 1980, the Board shall begin to put into effect a schedule of fees for such services which is based on those principles.

**(b) Covered services**

The services which shall be covered by the schedule of fees under subsection (a) of this section are—

(1) currency and coin services;

(2) check clearing and collection services;

(3) wire transfer services;

(4) automated clearinghouse services;

(5) settlement services;

(6) securities safekeeping services;

(7) Federal Reserve float; and

(8) any new services which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer of funds.

**(c) Criteria applicable**

The schedule of fees prescribed pursuant to this section shall be based on the following principles:

(1) All Federal Reserve bank services covered by the fee schedule shall be priced explicitly.

(2) All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

(3) Over the long run, fees shall be established on the basis of all direct and indirect costs actually incurred in providing the Federal Reserve services priced, including interest on items credited prior to actual collection, overhead, and an allocation of imputed costs which takes into account the taxes that would have been paid and the return on capital that would have been provided had the services been furnished by a private business firm, except that the pricing principles shall give due regard to competitive factors and the provision of an adequate level of such services nationwide.

(4) Interest on items credited prior to collection shall be charged at the current rate applicable in the market for Federal funds.

**(d) Budgetary consequences of decline in volume of services**

The Board shall require reductions in the operating budgets of the Federal Reserve banks commensurate with any actual or projected decline in the volume of services to be provided by such banks. The full amount of any savings so realized shall be paid into the United States Treasury.

In their complaint, filed February 17, 1983, the plaintiffs charged that the Board violated Section 107 of the MCA by directing the Reserve Banks to begin implementing previously determined new fee schedules, deposit deadlines and funds availability schedules for check collection services on

February 24, 1983. The plaintiffs asserted that the fees, presentment and availability schedules violated the MCA by tending to create a monopoly or near monopoly for the Federal Reserve Banks in the market for check collection and transportation services in violation of a congressional mandate that Reserve Banks compete on a fair and equal basis with their commercial clearing bank counterparts. This unfair competition was achieved, the plaintiffs claimed, by establishing fee schedules which failed to cover the full cost of the services offered by the Federal Reserve Banks. The plaintiffs charged that the fee schedules for use of the Interdistrict Transportation System (ITS), a component of the check clearing operations conducted by the Federal Reserve System had no relation to the cost of services actually offered and reflected "a deliberate pattern of predatory pricing." The ITS performs services for the Federal Reserve Banks and the banks which use their check collection services which is similar to that performed by the plaintiffs and other air couriers for private clearing banks and their check collection customers.

The plaintiffs based their demand for injunctive relief on claimed violation of the pricing criteria contained in 12 U.S.C. § 248a(c), *supra,* alleged failure to publish the plan for comment sufficiently in advance of the effective date and an asserted violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (1976).[1] The plaintiffs filed a motion for a temporary restraining order with supporting affidavits and the Board and one Reserve Bank filed responses in opposition to the motion, also supported by affidavits. After conducting a hearing the district court dismissed the action on February 22, 1983, upon concluding that the plaintiffs lacked standing to sue under the MCA and that the complaint failed to state

a claim upon which relief could be granted under the Sherman Act. Both the district court and this court denied motions to stay the judgment of dismissal.

## II.

We agree with the district court that the plaintiffs lack standing under the relevant statute,[2] the MCA. The plaintiffs are not banks and do not function as check processing or clearing centers. They are private air couriers which contract with banks other than Federal Reserve Banks that perform check collection services. None of the banks which utilize the transportation services of the plaintiffs joined in bringing this action.

### A.

The requirement that a plaintiff must have "standing" in order to bring an action in a federal court has been long recognized, and has been the subject of many decisions. The most recent Supreme Court statement on the subject is contained in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). In *Valley Forge* the court noted that standing involves both constitutional ("case" or "controversy") requirements and prudential considerations. After discussing some ambiguity concerning the nature of the standing requirement arising from earlier decisions, the Court identified the "irreducible minimum" constitutional requirement as follows:

A recent line of decisions, however, has resolved that ambiguity, at least to the following extent: at an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some ac-

---

1. Though the plaintiffs did not cite the Administrative Procedure Act (APA), 5 U.S.C. § 551 (1976) et seq., in their complaint, it is evident from the fact that they sought to enjoin action of the Federal Reserve "not in accordance with law" that they were seeking review under the APA. More specifically, 5 U.S.C. § 706(2)(A) provides for review of agency action which is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." The

plaintiffs did assert subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction).

2. Section 10(a) of the APA, 5 U.S.C. § 702, limits standing to a person who suffers legal wrong because of an agency action or is adversely affected or aggrieved by such action "within the meaning of a relevant statute ...."

tual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99 [99 S.Ct. 1601, 1607, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976). In this manner does Art. III limit the federal judicial power "to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process." *Flast v. Cohen, supra* [392 U.S. 83], at 97 [88 S.Ct. 1942, at 1951, 20 L.Ed.2d 947 (1968)].

454 U.S. at 472, 102 S.Ct. at 758 (footnote omitted). The Court also outlined the governing prudential considerations:

Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing. Thus, this Court has held that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. [490], at 499 [95 S.Ct. 2197, at 2205, 45 L.Ed.2d 343]. In addition even when the plaintiff has alleged redressable injury sufficient to meet the requirements of Art. III, the Court has refrained from adjudicating "abstract questions of wide public significance" which amount to "generalized grievances," pervasively shared and most appropriately addressed in the representative branches. *Id.,* at 499–500 [95 S.Ct. at 2205]. Finally, the Court has required that the plaintiff's complaint fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Orgs. v. Camp,* 397 U.S. 150, 153 [90 S.Ct. 827, 829, 25 L.Ed.2d 184] (1970).

454 U.S. at 474–75, 102 S.Ct. at 759 (footnotes omitted). Other federal courts have been required to deal with the standing issue on many occasions. We note particularly that the opinion of the court in *Community Nutrition Institute v. Block,* 698 F.2d 1239, 1245–46 (D.C.Cir.1983), contains a valuable discussion of the principles of standing. *See also Young v. Klutznick,* 652 F.2d 617 (6th Cir.1981), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982).

### B.

Standing is a threshold question in every federal case. In considering the question both the trial and appellate courts must accept all material allegations of the complaint as true and must construe the complaint in favor of the plaintiff. Affidavits which particularize the allegations of fact must also be considered. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Treating the complaint before us in this manner, the plaintiffs will lose business because their bank customers which provide check collection services will be unable to compete with the Federal Reserve Banks because of their below-cost pricing and will stop utilizing the services of private air couriers. Several affidavits by bank officials filed in support of the plaintiffs' position contain this prediction. The fact that the plaintiffs will suffer indirect rather than direct injury as a result of the Board's action does not necessarily deprive them of standing for failure to meet the constitutional requirement of injury. The Court discussed this issue in *Warth v. Seldin, supra,* 422 U.S. at 504–05, 95 S.Ct. at 2207–8:

The fact that the harm to petitioners may have resulted indirectly does not in itself preclude standing. When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights. *E.g., Roe v. Wade,* 410 U.S. 113, 124 [93 S.Ct. 705, 712, 35 L.Ed.2d 147] (1973). But it may make it substantially more difficult

to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm.

■ Though the injury to a plaintiff need not be direct to satisfy the constitutional requirement, it must at least be traceable to the challenged action of the defendant and must be an injury that the requested legal action will be likely to redress. In *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), the Court found that plaintiffs who claimed they would be denied medical services by hospitals which would refuse to admit indigent patients as the result of a ruling of the Internal Revenue Services lacked standing to contest validity of the ruling. The Court found it purely speculative whether a hospital's denial of services to one of the plaintiffs could fairly be traced to the IRS ruling, and stated the constitutional requirement of injury as follows:

> "Although the law of standing has been greatly changed in [recent] years, we have steadfastly adhered to the requirement that, at least in the absence of a statute expressly conferring standing, federal plaintiffs must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction." *Linda R.S. v. Richard D.,* 410 U.S. [614], at 617 [93 S.Ct. 1146, at 1148, 35 L.Ed.2d 536].[22] In other words, the "case or controversy" limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.

[22] The reference in *Linda R.S.* to "a statute expressly conferring standing" was in recognition of Congress' power to create new interests the invasion of which will confer standing. See 410 U.S., at 617 n. 3 [93 S.Ct., at 1148 n. 3]; *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205 [93 S.Ct. 364, 34 L.Ed.2d 415] (1972). When Congress has so acted, the requirements of Art. III remain: "[T]he plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants." *Warth v. Seldin, supra,* at 501 [95 S.Ct., at 2206]. See also, *United States v. SCRAP,* 412 U.S. 669 [93 S.Ct. 2405, 37 L.Ed.2d 254] (1973); cf. *Sierra Club v. Morton, supra* [405 U.S. 727], at 732 n. 3 [92 S.Ct. 1361, at 1365 n. 3, 31 L.Ed.2d 636 (1972)].

426 U.S. at 41–42, 96 S.Ct. at 1925–26.

■ The defendants argue that it is purely speculative whether any injury plaintiffs might suffer from business decisions of their present customers would result from the implementation of new schedules of fees and presentment times by the Board. They rely principally on this court's decision in *Young v. Klutznick, supra,* where the injury complained of would occur only if the Michigan legislature took or refrained from taking actions which might result in a dilution of representation in Congress for residents of Detroit. This case is distinguishable. Here, if the affidavits of customers of the air couriers are credited, these couriers will suffer economic losses flowing from actions which the private banks will take in response to the revised schedules of the Federal Reserve Banks. Though the injury alleged by the plaintiffs is indirect, it is "distinct and palpable" and "fairly traceable" to the action of the Board of Governors. *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978). We believe the plaintiffs have sufficiently alleged a "personal stake," *Id.,* in the outcome of the controversy and have demonstrated a likelihood that their injury would be redressed by a favorable decision. Thus they have satisfied the constitutional requirements for standing. *Community Nutrition Institute v. Block, supra,* 698 F.2d at 1244.

### C.

■ Even though the constitutional requirements for standing are satisfied, those based on prudential considerations must also be met in order for a plaintiff to go forward with an action. In *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), the Supreme Court described the non-constitutional require-

ment which is pertinent to this case as follows:

It [the question of standing] concerns, apart from the "case" or "controversy" test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

We have examined the text of Section 107 of the MCA in vain for any indication that Congress sought to protect the competitive position of private air couriers in requiring the Board of Governors to adopt and publish a set of pricing principles and a proposed schedule of fees for its services. Among the covered services for which a schedule of fees is required is "check clearing and collection services." 12 U.S.C. § 248a(b). The statute does not break these services down into their component parts. There is no indication that Congress was concerned with the source of the various components of these services. What is clear is that the covered services offered by Federal Reserve Banks are to be priced explicitly, are to be made available to non-member depository institutions at the same fees charged member banks, and that "[o]ver the long run, fees shall be established on the basis of all direct and indirect costs actually incurred in providing the Federal Reserve services priced ...." U.S.C. § 248a(c). These criteria are concerned with the depository institutions which use the services offered by the Federal Reserve, not with third parties who provide similar services, and certainly not with others who furnish some of the components of the services offered by such third parties. We find the legislative history of the MCA equally devoid of any indication that Congress intended to protect the competitive position of the plaintiffs. There are references in the floor debate on the bill which became the MCA to competition in bank services by the "private sector." *E.g.,* remarks by Senator Proxmire, 126 Cong. Rec. 53167 (daily ed. March 17, 1980). However, these references are to the banks and clearing houses which provide "both complementary and substitute systems to the Federal Reserve." *Id.* There is no indication of congressional concern with the means by which the private sector operates the complementary and substitute systems. House Conference Report No. 96–842, *reprinted* in [1980] U.S.Code Cong. & Adm. News, Vol. 1, pp. 236, 301, notes that the Federal Reserve Board is required to make an annual detailed report to Congress of its costs for the services offered and the means by which fees are determined "and the impact of its service offerings and the fees charged on competing or potentially competing service providers, depository institutions and private consumers." The "service providers" are those private institutions offering check clearing services, not third parties such as the plaintiffs which perform some of the steps in the check clearing process. We conclude that the air couriers are not "service providers," and it is clear they are neither depository institutions nor private consumers.

The only case similar to the present case of which we are aware is *Bank Stationers Association v. Board of Governors,* 704 F.2d 1233 (11th Cir.1983). There printers of personal checks brought suit to enjoin the Federal Reserve Board of Governors from charging fees for automated clearing house services which are insufficient to cover the cost of providing such services. Automated clearinghouse services make transfers by computer, which eliminate the need for printed checks. The court held that the plaintiffs had sufficiently alleged injury in fact, but had not demonstrated that they were arguably within the zone of interests which Congress sought to protect in enacting the MCA. Like the stationers, the air couriers do not provide check clearing services. They only perform functions for those private check clearing establishments which provide such services and those depository institutions which use such private providers. The competitive concerns of the statute do not reach the level of the plaintiffs' activities. Thus we conclude they are not arguably within the zone of interests which Congress sought to protect in enacting the MCA.

### III.

The other ground on which the plaintiffs sought injunctive relief requires little discussion. Section 2 of the Sherman Act makes "every person" who monopolizes, attempts to monopolize, or combines or conspires with any other person to monopolize, trade or commerce among the states guilty of a misdemeanor. 15 U.S.C. § 2 (1976). The plaintiffs contend that the Federal Reserve Banks are corporations and therefore persons within the Sherman Act which defines "persons" to include corporations.

The district court held that none of the defendants in this action is a person within the meaning of this antitrust law. We agree. The argument of the plaintiffs overlooks the fact that the Federal Reserve Banks are not private business corporations, but are part of a system created by Congress to perform important governmental functions. The Federal Reserve System, consisting of the Board of Governors and the twelve Federal Reserve Banks, functions as the nation's chief money manager. It is this nation's central bank, performing a vital governmental role. The court in *Federal Reserve Bank of Boston v. Commissioner of Corporations and Taxation,* 499 F.2d 60, 62–63 (1st Cir.1972), described this role as follows:

> While savings and loan associations may in many ways be analogized to private corporations, federal reserve banks, by contrast, are plainly and predominantly fiscal arms of the federal government. Their interests seem indistinguishable from those of the sovereign . . . .
> There are twelve such banks in the nation, of which the plaintiff is one. They were created and are operated in furtherance of the national fiscal policy. They are not operated for the profit of shareholders, and do not provide ordinary commercial banking services; their stockholders, the member banks, lack the powers and rights customarily vested in shareholders of a private corporation. Federal reserve banks act as depositories for money held in the United States Treasury and as fiscal and monetary agents of the United States. 12 U.S.C. § 391. They hold the legal reserves of member banks,

> issue currency, facilitate check clearance and collection, and have supervisory duties as to member banks. They also provide important services for the Treasury with respect to the public debt and the issuance, handling and redemption of government securities. The limited income generated is used to pay expenses and dividends limited to 6 percent. Any remaining earnings are paid into the surplus fund, 12 U.S.C. § 289, where they may be used by the United States Treasury to supplement the gold reserve. Should a federal reserve bank go into liquidation, any surplus becomes the property of the United States, 12 U.S.C. § 290. *See generally* Board of Governors, The Federal Reserve System: Purposes and Functions (5th ed. 1969).

(Footnote omitted).

■ As an agency of the federal government the Federal Reserve System may not be sued under the Sherman Act. In *Sea-Land Service, Inc. v. Alaska Railroad,* 659 F.2d 243 (D.C.Cir.1981), *cert. denied,* 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982), the court held that an entity wholly owned and operated by the United States was not amenable to suit under the Sherman Act. *See also Champaign-Urbana News Agency, Inc. v. J.L. Cummins News Co., Inc.,* 632 F.2d 680 (7th Cir.1980). The plaintiffs argue that *Sea-Land Service* is not controlling because there the government was the sole owner of the railroad whereas it is not the sole owner of the Federal Reserve Banks, which do have private shareholders. We think this distinction is immaterial. It is the role of the Federal Reserve System as manager of the fiscal affairs of the federal government and the money supply of the nation which places the Reserve Banks outside the Sherman Act definition of persons. In a different context the Supreme Court has held that where monopoly results from "valid governmental action, as opposed to private action, no violation of the [Sherman] Act can be made out." *Eastern Railroad Presidents Conference v. Noerr, Motor Freight, Inc.,* 365 U.S. 127, 136, 81 S.Ct. 523, 528, 5 L.Ed.2d 464 (1961). In promulgating the

schedules complained of by the plaintiffs the Board was following the directions of Congress in the MCA; it was engaged in "valid governmental action."

The judgment of the district court is affirmed.