**CITY OF LOUDON, TENNESSEE, d/b/a Loudon Utilities Board, Plaintiff,**

v.

**TENNESSEE VALLEY AUTHORITY and Tennessee Valley Public Power Association, Defendants.**

**No. CIV–1–83–308.**

United States District Court, E.D. Tennessee, S.D.

Jan. 30, 1984.

John Gibson, Loudon, Tenn., for plaintiff.

Herbert S. Sanger, Jr., Gen. Counsel, James E. Fox, Assoc. Gen. Counsel, Robert C. Glinski, Edwin W. Small, Tennessee Valley Authority, Knoxville, Tenn., for Tennessee Valley Authority.

Carlos Smith, Chattanooga, Tenn., for Tennessee Valley Public Power Ass'n.

## MEMORANDUM

MILBURN, District Judge.

The City of Loudon, Tennessee, d/b/a Loudon Utilities Board (hereinafter, Loudon), a municipality, is bringing an action against the Tennessee Valley Authority (hereinafter, TVA) and the Tennessee Valley Public Power Association (hereinafter, TVPPA), an association of local power distributors. Loudon seeks damages and an injunction, claiming that TVA's power supply contract with Loudon violates the federal antitrust laws. The detailed allegations of Loudon's complaint are that: (1) Section 2(b) of the contract between TVA and Loudon violates the Sherman Act, 15 U.S.C. §§ 1, 2 (1976) (¶ V); (2) TVA's supplying of power to the A.E. Staley Manufacturing Company (hereinafter, Staley) directly rather than selling such power to Loudon for resale to Staley violates the preference provisions of Section 10 of the TVA Act, 16 U.S.C. § 831i (1976) (¶ V); (3) such direct service violates a promise by TVA to Loudon to help obtain industrial customers for the Loudon service area (¶ V); (4) Section 2(b) is unconscionable and in violation of public policy (¶ VI); and (5) TVA's contracts with its distributors illegally permit some distributors to serve industrial customers while prohibiting other distributors such as Loudon from doing so (¶ VII). (Court File # 1). This action is presently before this Court on defendants TVA and TVPPA's motions pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment.

### FACTS

Loudon is a municipal corporation created and existing under the laws of the State of Tennessee and operates and does business as the Loudon Utilities Board. The Loudon Utilities Board buys its electric power from TVA and resells it to its customers. TVA and Loudon, d/b/a Loudon Utilities Board, entered into a contract on December 4, 1978, for the purpose of selling to the municipality power generated by TVA. The contract contains a specific provision, Section 2(b), which gives TVA the right to sell power directly to any customer whose energy requirements are sufficiently large, as determined by a certain formula which is set out in that section of the contract. Section 2(b) of the contract has the effect of giving TVA the right to sell directly to a large industrial firm, Staley, which is located in the Loudon service area. Loudon desires to serve this customer directly. The TVPPA is an association of distributors of TVA power (i.e., municipalities and cooperatives which resell power). The TVPPA, from which Loudon has resigned, was instrumental in negotiating Section 2(b) which is, as TVA points out, a standard provision of the contracts between TVA and the municipal distributors of TVA power.

There are facts on the record which suggest that the formula used by TVA in selecting the large customers it should serve could be revised and updated; however, they do not prove that TVA is unfair in applying its present formula to all its present distributors or that necessarily the formula must be revised. See Affidavit of Albert O. Daniels (Court File # 9).

Although the complaint and briefs of counsel bring up several issues, it appears that the entire motion for summary judgment turns on the question of whether TVA is able to be sued under the antitrust laws of the United States. This Court holds that under the facts of this case, TVA is indeed immune to suit under the antitrust laws and grants summary judgment in its favor.

### DISCUSSION

### THE SHERMAN ACT

TVA is a wholly owned corporate agency and instrumentality of the federal govern-

ment. See *Webster Cty. Coal v. Tennessee Valley Authority*, 476 F.Supp. 529, 532 (W.D.Ky.1979); *Tennessee Valley Authority v. Mason Coal, Inc.*, 384 F.Supp. 1107, 1115 (E.D.Tenn.1974). In fact, the *Webster Cty.* case holds that as an agency and instrumentality of the federal government, TVA is exempt from antitrust laws even though the municipality involved in that case argued, as has Loudon here, that TVA's grant of the corporate power to sue and be sued under 16 U.S.C.A. § 831c(b) (1974) should make it liable to antitrust suit. 476 F.Supp. at 532.

Another case, *Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243 (D.C.Cir.1981), *cert. denied*, 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982) cited *Webster Cty.* and held the Alaska Railroad exempt from antitrust liability even though Sea-Land alleged that the railroad was a carrier in direct competition with it and had entered into arrangements in an effort to monopolize the particular market involved and preclude Sea-Land from competing in it. The D.C. Circuit held "that Congress did not place the United States or its instrumentalities under the governance of the Sherman Act ... (and) ... that appellants may not maintain this action against the Alaska Railroad and the United States agencies and officers that supervise its operation." 659 F.2d at 244.

■ Generally, to determine the applicability of the Sherman Act to a regulated industry, courts must consider whether and to what extent Congress intended to exempt activities of that industry from the antitrust laws. This can be determined through an examination of the legislative history and the administrative scheme itself. *In Re Ocean Shipping Antitrust Litigation*, 500 F.Supp. 1235, 1240 (S.D.N.Y.1980). This type of policy analysis was recently applied in a case instructive to the present case by our circuit, *Jet Courier Serv., Inc. v. Federal Reserve Bank*, 713 F.2d 1221 (6th Cir.1983). The Sixth Circuit held in *Jet Courier* that even though the Federal Reserve Banks are corporations whose stock is privately owned, they are

nevertheless not subject to the Sherman Act because they "are not private business corporations, but are part of a system created by Congress to perform important governmental functions." 713 F.2d at 1228. TVA, which is not privately owned, also serves an important governmental function.

The case of *Volunteer Electric Coop. v. Tennessee Valley Authority*, 139 F.Supp. 22 (E.D.Tenn.1954), a contract case, expresses the policy behind allowing TVA to serve large industries in the following manner:

Granted the Act states preference shall be given to states, counties, municipalities, and cooperatives not organized for profit. However the Act does not end there. In a subsequent section it expressly states that *sales to industries shall be a secondary purpose "to be utilized principally to secure a sufficiently high load factor and revenue returns which will permit domestic and rural use at the lowest possible rates and in such manner as to encourage increased domestic and rural use of electricity."* 16 U.S.C.A. § 831j. The provisions cited are not conflicting... *The policy voiced by the statute empowering defendant to sell direct to industry and pass on to members of the preferred classes the benefits derived thereby are salutary and in furtherance of the avowed intent of the preceding section.* Defendant has, from its inception, sold a portion of its power direct to large industries in conformity with that policy. Express approval of defendant's programs in this respect has been voiced by Congress through a joint committee which investigated defendant's practices of direct sales to industry. (S.Doc. 56, 76th Congress, 1st Session 1939). As defendant points out, through the years the earnings realized from such direct sales have been reflected in lower wholesale rates to distributors such as plaintiff with a resulting saving to the ultimate consumer... No wording in the Act directs the courts to subro-

gate the interests of the classes intended to be protected to those of a small class of distributors in clear violation of the true meaning of the Act just because some distributors are fortunate enough to have large industrial loads located within their service areas and others do not. In the service of large industrial loads with peculiar service problems, particularly as is the case here where additional problems of supplying stand-by-power and purchasing surplus power are involved, it cannot be seen how any question of preference to plaintiff arises. Rather defendant is acting within its authority to sell to industry for the benefit of all members of the preferred classes enumerated in the statute.

139 F.Supp. at 26 (emphasis added). In addition to the policy stated in *Volunteer,* TVA has broad ratemaking and contractual powers that are overseen by Congress itself and with which this Court will not interfere unless clearly compelled. See generally, *Mobil Oil Corp. v. Tennessee Valley Authority,* 387 F.Supp. 498 (N.D. Ala.1974). Moreover, the TVA Act itself provides in pertinent part:

> [T]he Board is authorized to include in any contract for the sale of power such terms and conditions, including resale rate schedules, and to provide for such rules and regulations as in its judgment may be necessary or desirable for carrying out the purposes of this Act.... TVA Act, § 10, 48 Stat 64 (1933), as amended by 49 Stat 1074 (1935), 16 U.S.C. § 831i (1976).

Congress and the Act give TVA broad ratemaking powers, and it would appear that proposed revisions of the rate formula would be better addressed to Congress or the TVA board. This Court is reluctant to strike down a ratemaking formula when it feels that it should or would be replaced by a similar formula which, although it might be more liberal, might still not allow Loudon to sell directly to Staley.

 In sum, where monopoly results from "valid governmental action, as opposed to private action, no violation of the [Sherman] Act can be made out." *Jet Courier Serv. Inc. v. Federal Reserve Bank,* 713 F.2d 1221 at 1228–29 (6th Cir. 1983) (quoting *Eastern Railroad Presidents Conference v. Noerr, Motor Freight, Inc.,* 365 U.S. 127, 136, 81 S.Ct. 523, 529, 5 L.Ed.2d 464 [1961]). In enforcing section 2(b) of its contract with Loudon, TVA was engaged in valid governmental action and exempt from the antitrust laws of the United States.

## PREFERENCE CLAUSE

 Loudon also contends that TVA's supplying of power to Staley directly rather than selling such power to Loudon for resale to Staley violates the preference provisions of Section 10 of the TVA Act, 16 U.S.C. § 831i (1976). The *Volunteer* case, cited *supra,* expressly rejected this argument. In the rather lengthy quote, *supra,* the *Volunteer* Court stated that selling to large industries directly by TVA was a salutary policy because it enabled TVA to sell electricity at lower rates to its domestic and rural customers. See page 86, *supra.* Read broadly, this case gives TVA the right to use whatever reasonable formula it determines proper to choose its direct customers; therefore, we hold that TVA's supplying of power to Staley directly rather than selling such power to Loudon for resale does not violate the preference provisions of the TVA Act.

## ASSERTED PROMISE

 Loudon alleges that direct service to Staley violates a promise by TVA to Loudon to help obtain industrial customers for the Loudon service area. Loudon does not allege that TVA's alleged promise to help recruit industrial customers was accompanied by any agreement to modify the provisions of Section 2(b) and (c) of Loudon's power contract with TVA, which clearly specify when industrial customers are to be supplied by the distributor and when by TVA. Had Staley's energy requirements been within the limits applicable to distributor service under Section 2(b), Loudon could have served it. Although TVA's dis-

cussions with Loudon may have led the municipality on in a way that was not proper, no legally enforceable violation of a promise or contract appears as a matter of law.

## UNCONSCIONABILITY

Unconscionability may be thought of or defined as a violation of public policy. See, *e.g.*, *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129 at 138 (5th Cir.); *Robinson Ins. & Real Estate, Inc. v. Southwest Bell Tel. Co.*, 366 F.Supp. 307, 309–10 (W.D.Ark.1973); J. White and R. Summers, *Uniform Commercial Code* (1972) at 112 & 117. In addition, the Supreme Court long ago pointed out in *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290, 340, 17 S.Ct. 540, 558, 41 L.Ed. 1007 (1897), that public policy is primarily for Congress to determine:

> The public policy of the Government is to be found in its statutes, and when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials; but when the lawmaking power speaks upon a particular subject, over which it has constitutional power to legislate, public policy in such a case is what the statute enacts.

Accordingly, the holding in *Volunteer*, cited *supra*, that direct TVA service to large industries furthers the policy and intent of the TVA Act, is conclusive against the position argued by Loudon in this case—that Section 2(b) is unconscionable.

## ILLEGAL FAVORITISM

Finally, Loudon alleges that TVA's contracts with its distributors illegally permit some distributors to serve industrial customers while prohibiting other distributors such as Loudon from so doing. No justiciable issue is presented. Section 2(b) of the power contract between TVA and Loudon is a standard provision contained in all TVA wholesale power contracts. Moreover, as the language of the provision itself shows, a distributor like Loudon can serve an industrial customer as long as that cus-

tomer's energy requirements are within a formula amount. This formula as applied uniformly is fully consistent with and designed to carry out the purpose of Section 11 of the TVA Act. Large industrial loads involve not only benefits in the form of revenues, but also risks since they are subject to sudden and drastic reductions and complete cessation because of corporate decisions, depressed economic conditions, strikes and the like. Such reductions or cessations could in turn severely affect the financial soundness of a distributor and cause it to raise rates sharply to other customers in an effort to compensate the lost revenues, after having previously reduced rates because of the revenues which the industrial loads temporarily provided. Such results would be contrary to TVA's mandate under Section 11 of the Act to use the supplying of TVA-generated power to industrial customers "to secure a sufficiently high load factor and revenue return which will permit domestic and rural use at the lowest possible rates." See *AFG Indus., Inc. v. Holston Elec. Coop.*, 556 F.Supp. 33 n. 2 (E.D.Tenn.1982).

For these reasons, namely, TVA's formula is applied uniformly to its distributors in accordance with Congressional policy and bargained for by contract open to negotiation, the Court finds the contention of Loudon that TVA's contracts unfairly permit some distributors to serve larger industries than others to be baseless. The formula is a sliding scale which attempts to allocate fairly and to carry out the Congressional policy for the TVA Act.

Because this Court can find no merit as a matter of law in any of Loudon's contentions, it must enter an Order granting TVA summary judgment in this case.