866 F.2d 38
 57 USLW 2439, 7 UCC Rep.Serv.2d 956
 GREATER BUFFALO PRESS, INC., Individually, and as payee and
holder and on behalf of each other similarly situated payee
and holder on Appendix A; of returned or non-paid checks or
cash items drawn by Neisner Brothers, Inc., on Chase Lincoln
First Bank, N.A. (formerly The Lincoln First Bank),
Plaintiffs- Appellants,
v.
FEDERAL RESERVE BANK OF NEW YORK, and the Buffalo, New York
Branch thereof; John T. Keane, Individually, and
as Officer and Manager thereof,
Defendants- Appellees.
 No. 141, Docket 88-7328.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 14, 1988.
Decided Jan. 18, 1989.
 
 Arnold Weiss, Buffalo, N.Y. (Raichle, Banning, Weiss & Stephens, Buffalo, N.Y., of counsel), for plaintiffs-appellants.
 Thomas C. Baxter, Jr., Associate Gen. Counsel, Federal Reserve Bank of New York, New York City (Ernest T. Patrikis, General Counsel, Steven T. Smith, Federal Reserve Bank of New York, New York City, Brian J. Troy, Ronald A. Huebsch, Jaeckle, Fleischmann & Mugel, Buffalo, N.Y., of counsel), for defendants-appellees.
 Before MESKILL, KEARSE and MAHONEY, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 This is an appeal from a judgment of the United States District Court for the Western District of New York, Curtin, C.J., granting the summary judgment motion of the Federal Reserve Bank of New York (Fed NY) and John T. Keane and dismissing the complaint.
 
 
 2
 The suit also included as a defendant Marine Midland Bank, N.A. (Marine). Marine's own motion for dismissal was granted by the district court; plaintiffs do not appeal from this decision. The sixty-five plaintiffs alleged that they had suffered injury because of defendants' participation in the processing of checks belonging to the plaintiffs.
 
 
 3
 We affirm.
 
 BACKGROUND
 
 4
 A. Federal Reserve Banks and the Process of Check Collection
 
 
 5
 Federal Reserve Banks play a major role in the nation's system of check collection. See The Comptroller General, Report to the Congress: The Federal Reserve Should Move Faster to Eliminate Subsidy of Check Clearing Operations 4 (1982) (the Federal Reserve collects over forty percent of the checks written in the United States), J.App. 935, 936; Clarke, Check-Out Time for Checks, 21 Bus.Law. 931, 932 (1966) (one-third of checks are sent to Federal Reserve Banks), J.App. 793, 795. The check collection process, or specifically Fed NY's participation in it, is at the center of this dispute. For that reason, we briefly examine some background. See generally H. Hutchinson, Money, Banking, and the United States Economy 117-27 (5th ed. 1984); Baxter and Patrikis, The Check-Hold Revolution, 18 U.C.C.L.J. 99, 114-17 (1985), J.App. 751, 766-69.
 
 
 6
 When payment is made by means of a check, a payor draws the check against an account at his or her bank, the payor bank. Upon receiving the check, the payee will often deposit it in his or her own bank, the depositary bank. At this point, two processes must occur. First, the check itself must be physically transported from the depositary bank to the payor bank. Second, payment must be made from the payor bank back to the depositary bank.
 
 
 7
 One option available to the depositary bank is to utilize the check clearing services of the Federal Reserve System. In order to do so, the depositary bank must send the check to the Federal Reserve Bank for its district. If the payor bank is in the same district, then the Federal Reserve Bank can present the check directly to the payor bank. If the payor bank is located in a different district, the Federal Reserve Bank receiving the check will forward it to the Federal Reserve Bank for the payor bank's district. That Federal Reserve Bank will then present the check to the payor bank.
 
 
 8
 In addition to effecting the physical delivery of the check, the Federal Reserve System also serves to facilitate payment between the payor and depositary banks. After sending a check to its Federal Reserve Bank for processing, the depositary bank will receive credit for the check in its reserves account with the Federal Reserve. This credit will be given usually within one or two days, depending on how long it is expected to take the check to reach the payor bank for payment. After the check reaches the payor bank, the Federal Reserve System uses transfers of credit through an Interdistrict Settlement Fund to achieve payment.
 
 
 9
 If there is an unexpected delay in transporting the check to the payor bank, then the credit for the check will be given by the Federal Reserve to the depositary bank before payment can be received from the payor bank. This so-called "float" in effect gives the depositary bank an interest-free advance at the expense of the Federal Reserve. Thus, delays in processing not only adversely affect Federal Reserve Banks with respect to the competitive attractiveness of their check clearing services, but also result in direct economic costs, see Baxter and Patrikis, supra at 117, J.App. at 769.
 
 
 10
 Throughout most of its history, the Federal Reserve has provided these check clearing services only to member banks, or other banks that maintained reserve accounts with the Federal Reserve. See Jet Courier Services, Inc. v. Federal Reserve Bank of Atlanta, 713 F.2d 1221, 1222-23 (6th Cir.1983); Carson v. Federal Reserve Bank of New York, 254 N.Y. 218, 172 N.E. 475, 478 (1930) (Cardozo, C.J.); 14 Fed.Reserve Bull. 80 (1928). These services were provided at no charge, apparently to promote Federal Reserve membership by compensating member banks for the costs associated with having to maintain non-interest bearing reserves with the Federal Reserve. See Oversight on the Payments Mechanism, the Federal Reserve's Role in Providing Payments Services, and the Pricing of Those Services: Hearings Before the Senate Comm. on Banking, Housing, and Urban Affairs, 95th Cong., 1st Sess. 120-21 (1977) (testimony of Philip E. Coldwell) (hereinafter Coldwell testimony ), J.App. 944, 954-55. In 1980, however, Congress enacted the Monetary Control Act of 1980, Pub.L. 96-221 tit. I, 94 Stat. 132, 132-41. This Act provided, inter alia, that all banks in the United States would be required to maintain reserves with the Federal Reserve. Additionally, check clearing services were now to be made available to all banks, regardless of whether or not they were member banks, but all banks would henceforth have to pay for the service. See Jet Courier Services, 713 F.2d at 1222-23; McNeill and Rechter, The Depository Institutions Deregulation and Monetary Control Act of 1980, 66 Fed.Reserve Bull. 444, 444-48 (1980), J.App. 908, 908-12.B. The Facts Leading to This Litigation
 
 
 11
 In 1977, the sixty-five plaintiffs-appellants were all supplier-creditors of Neisner Brothers, Inc. (Neisner), a retail department store chain. The dispute in this case arises from seventy-five checks drawn by Neisner, in October and November of 1977, on its account at Lincoln First Bank of Rochester (Lincoln) and made payable to the appellants. After receiving the checks, the appellants deposited them at their various depositary banks around the country. Greater Buffalo Press, for example, maintains that it deposited one check for $43,537.66 on November 21, 1977 and one check for $109,671.55 on November 23, 1977 in its account at Marine.
 
 
 12
 After receiving the checks, the various depositary banks forwarded them for collection to the defendant-appellee Fed NY, either directly or indirectly, through other Federal Reserve Banks. The district court accepted Fed NY's contentions as to the dates it received the checks.[1] The court found that Fed NY received three of the seventy-five checks between November 19-22, nine of the checks between November 24-25 and sixty-three of the checks on or after November 26.
 
 
 13
 The next step in the collection process called for Fed NY's Buffalo Branch to forward the checks to the payor bank, Lincoln, for payment. The parties are in substantial agreement as to the days the checks were finally received by Lincoln, and Fed NY concedes that there were delays due to an "unprecedented" increase in the volume of checks requiring processing, Br. of Defendants-Appellants at 12. For example, the $43,537.66 check payable to Greater Buffalo Press was received by Fed NY on either November 21 or 22, but was not presented to Lincoln until December 5, J.App. at 566.
 
 
 14
 Neisner filed a petition for bankruptcy December 1, 1977. The district court found that Lincoln had begun to dishonor the checks of Neisner on November 29, but the appellants maintain that Lincoln only began to dishonor Neisner's checks after learning of the filing of the bankruptcy petition on the morning of December 1.[2] When the checks were presented for payment, Lincoln dishonored them. The checks were returned to Fed NY, and from there back to the appellants' depositary banks. In at least some cases, a second attempt at collection was made, but the checks were again dishonored by Lincoln.
 
 C. The Litigation
 
 15
 We briefly summarize the prolonged history of this litigation. The plaintiffs filed their first complaint on January 11, 1978, naming as defendants Fed NY, John T. Keane, manager of Fed NY's Buffalo Branch, and other unnamed officers of that bank. Generally, the plaintiffs' claim was that their checks were dishonored because of deficiencies in the defendants' check processing. An amended complaint was filed on May 8, 1978, adding Marine, Greater Buffalo Press' depositary bank, as a defendant, and dropping the reference to unnamed officers. Discovery began, and the plaintiffs subsequently moved for class certification and summary judgment in April 1980. The motion for class certification would ultimately be denied, but counsel for Greater Buffalo Press was permitted to proceed as counsel for all plaintiffs. See J.App. at 1521 & n. 11.
 
 
 16
 On December 31, 1980, the district court struck portions of the complaint. The court noted that "[t]he precise legal theory on which the complaint proceeds ... cannot be determined from the complaint.... Plaintiff continues to insist on a panoply of alternative theories, despite the fact that the case has now been in discovery for a considerable period." J.App. at 395. The court nevertheless permitted the plaintiffs to replead with greater specificity. Id. at 404.
 
 
 17
 In September 1981, the plaintiffs filed a "Proposed Second Amended Complaint." Without addressing defendants' objections to this complaint, the district court encouraged the parties to conduct settlement discussions. Such discussions proved unsuccessful. Several years later, on August 15, 1986, the plaintiffs filed, with the permission of the district court, their final complaint, the "New Second Amended Complaint."
 
 
 18
 On February 18, 1987, Fed NY and Keane filed a motion seeking dismissal of the complaint or, in the alternative, summary judgment. Marine also moved for dismissal. On May 29, 1987, the plaintiffs cross-moved for summary judgment or for leave to amend their complaint to add as defendants other depositary banks, forwarding banks and presenting banks in addition to Marine.
 
 
 19
 The district court heard argument on November 6, 1987, and issued its decision and order on March 17, 1988. The court granted both the summary judgment motion of defendants Fed NY and Keane and Marine's dismissal motion. The entire complaint was thus dismissed.
 
 
 20
 The plaintiffs filed a Notice of Appeal on April 15, 1988 purporting to challenge all aspects of the district court judgment. Subsequently, the parties filed with this Court a stipulation dropping Marine from this appeal. Thus, the only issue we need consider is whether the district court erred in granting the summary judgment motion of the Fed NY and Keane. See, e.g., Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir.1984); United States v. Banerman, 552 F.2d 61, 63 n. 2 (2d Cir.1977).
 
 DISCUSSION
 
 21
 In reviewing this matter, we must ask whether the record, read in the light most favorable to the appellants, reveals the existence of any material issue of fact and whether the district court properly applied the law. See City of Yonkers v. Otis Elevator Co., 844 F.2d 42, 45 (2d Cir.1988). The mere existence of some disputed facts will not require reversal. The disputed facts must be material. As the Supreme Court has said: "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); see also Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir.1988). We thus examine first the "substantive law applicable in the case." Id.
 
 A. Governing Law with Respect to Liability
 1. The Legal Basis for the Cause of Action
 
 22
 The crux of appellants' complaint is that but for Fed NY's delays in processing their checks, the appellants would have been paid because the checks would have arrived at Lincoln in time to be honored. The appellants have cited Fed NY's assurance to the public of prompt and efficient check clearing services, contending that it was all the while sitting on a mountain of checks that continuously grew faster than Fed NY could process them. They contend that Fed NY foresaw or should have foreseen the processing delays and should have either remedied the situation or warned its customers of potential problems. Instead, the appellants contend, Fed NY sought to cover up the situation.
 
 
 23
 While constantly pressing a broad censure of Fed NY's operations, the appellants' specific legal theory supporting their first amended complaint remained unclear. Nearly three years after the commencement of this action, the district court was still dealing with this problem patiently, giving appellants every opportunity to replead with greater specificity. See J.App. at 404. More than six years later, the appellants' position remained imprecise if not evasive, characterizing their cause of action as including "basic tort and contract claims ... including tort, fraud, conversion, breach of contract, etc." J.App. at 1061.
 
 
 24
 It is obvious that the appellants cannot recover against Fed NY by simply criticizing its operations. In order to survive a summary judgment motion, the appellants had to present supporting facts and arguments showing some legal basis for liability on the part of the defendants; it was not enough simply to put forth conclusory allegations of wrongdoing. See Miracle Mile Associates v. City of Rochester, 617 F.2d 18, 21 (2d Cir.1980); Securities and Exchange Commission v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978).
 
 
 25
 We agree with the district court's approach in viewing the cause of action on this record as sustainable only by reliance on the provisions of New York's Uniform Commercial Code that deal specifically with the duties of banks in collecting and processing checks. See N.Y.U.C.C. Secs. 4-201, 4-202 (McKinney 1964). The district court found meritless the appellants' arguments as to possible alternative theories of liability. See J.App. at 1520 & nn. 8 & 9. We too are unable to discern from the record any other legal basis for liability on the part of Fed NY or Keane. To the extent that the facts might support some other conceivable basis for such liability, we find that the appellants' unsubstantiated conclusory allegations of wrongdoing were properly considered by the district court to have been insufficient to survive the summary judgment motion.
 
 
 26
 2. Liability Under The New York Uniform Commercial Code
 
 
 27
 The New York Uniform Commercial Code, section 4-202(1) imposes certain duties on "collecting bank[s]." Three of these duties on a quick reading might seem relevant to the facts of this case. The Code provides:
 
 
 28
 A collecting bank must use ordinary care in
 
 
 29
 (a) presenting an item or sending it for presentment; and
 
 
 30
 (b) sending notice of dishonor or non-payment or returning an item ... to the bank's transferor or directly to the depositary bank ... after learning that the item has not been paid or accepted, as the case may be; and
 
 
 31
 ....
 
 
 32
 (e) notifying its transferor of any loss or delay in transit within a reasonable time after discovery thereof.
 
 
 33
 N.Y.U.C.C. Sec. 4-202(1). Fed NY does not contest that, as a "collecting bank," these provisions apply to its processing of checks.
 
 
 34
 This provision imposes on Fed NY a duty of ordinary care in its presentment of checks for payment. The focus of the appellants' complaint is Fed NY's delay, after having received the checks, in presenting them to Lincoln. They base their cause of action in part on the contention that Fed NY breached its duty and that the breach caused the dishonor of their checks. If applicable to this case, Fed NY would bear the burden of showing that it exercised ordinary care in processing the checks if the checks were not properly processed within the "midnight deadline." See N.Y.U.C.C. Sec. 4-202(2).
 
 
 35
 Section 4-202(1)(b) requires collecting banks to give prompt notification of the dishonor of checks. This provision has no application to this case, however. Appellants have not shown or even argued that Fed NY delayed in providing notification of Lincoln's dishonor of the checks. Rather, their alleged injury stems from the dishonor itself, not from any delay in notification of the dishonor. Cf. Washington Petroleum and Supply Co. v. Girard Bank, 629 F.Supp. 1224, 1226 (M.D.Pa.1983) (allegation of injury from delayed notification of dishonor).
 
 
 36
 Section 4-202(1)(e) requires collecting banks to give prompt notice to a transferor of any "loss or delay in transit." At oral argument, the appellants relied on this section, contending that Fed NY at the very least should have alerted the appellants to the delays in the processing of their checks, thus giving them an opportunity to arrange alternative means of processing.
 
 
 37
 The appellants have not shown, and we have serious doubt as to whether they would be able to show, how a failure to warn of the delays would be causally linked to the dishonor of the checks. A trier of fact would have to question whether the appellants, armed with notice of the processing delay but without the benefit of hindsight or advance warning of Neisner's bankruptcy petition, would have either retrieved their checks from Fed NY or arranged for alternative clearinghouse services. In our review of a grant of summary judgment, however, we do not rely on these weaknesses in the appellants' case. Rather, we simply note that the appellants have no cause of action on these facts based on section 4-202(1)(e). That section applies where delays were caused by "mishaps in the mails," not to delays caused by the collecting bank's own internal processing operations, the situation present in our case. See United States Fidelity and Guaranty Co. v. Federal Reserve Bank of New York, 590 F.Supp. 486, 494 (S.D.N.Y.1984) (citing Northpark National Bank v. Bankers Trust Co., 572 F.Supp. 524, 531 (S.D.N.Y.1983)), aff'd, 786 F.2d 77 (2d Cir.1986) (per curiam).
 
 
 38
 Thus, we find that the only duty created by section 4-202(1) that is relevant here is Fed NY's duty of ordinary care in the presentment of checks under section 4-202(1)(a). But, in order to recover under this section, the appellants must show more than Fed NY's breach of duty. They also must show that the duty extended to them.
 
 
 39
 Section 4-201 of the Uniform Commercial Code says: "Unless a contrary intent clearly appears and prior to the time that a settlement given by a collecting bank for an item is or becomes final ... the bank is an agent or sub-agent of the owner of the item." As the Fifth Circuit has recognized: "The agency relationship established by Sec. [4-201] is the only basis in the Code for determining to whom the duties imposed on collecting banks [by Sec. 4-202(1) ] run. Once that agency relationship is severed, the duties are no longer owed. More simply stated, liability flows only from agency status." Childs v. Federal Reserve Bank, 719 F.2d 812, 814 (5th Cir.1983) (per curiam) (emphasis added). The appellants' cause of action thus rests solely on an agency theory, and their complaint must stand or fall on their contention that Fed NY acted as their agent.
 
 3. The Effect of Federal Regulation J
 
 40
 In considering the availability to the appellants of a cause of action based on the U.C.C., we have thus far considered only New York state law. As required by the Supremacy Clause, U.S. Const. art. VI, however, the state U.C.C. statutes cannot be considered in isolation but instead must be read together with applicable federal statutes and regulations. See United States Fidelity, 590 F.Supp. at 489 n. 4, aff'd per curiam, 786 F.2d 77.
 
 
 41
 The Board of Governors of the Federal Reserve System promulgates regulations governing the operation of the Federal Reserve System. See 12 C.F.R. Secs. 201-269b (1988). Pursuant to its authority under 12 U.S.C. Secs. 248(i), 248(o), 342, 360 (1982) and other laws, the Board of Governors has promulgated Regulation J, concerning the collection of checks. See 12 C.F.R. Sec. 210.1 (1988); 14 Fed.Reserve Bull. 80 (1928). The appellants have not called into question the Board of Governors' authority to promulgate regulations, nor the propriety of the promulgation of this particular regulation. See Childs, 719 F.2d at 815. Thus, as a properly promulgated substantive regulation, Regulation J must be given the force and effect of federal law. See Chrysler Corp. v. Brown, 441 U.S. 281, 295-96, 99 S.Ct. 1705, 1714-15, 60 L.Ed.2d208 (1979).
 
 
 42
 At the time the actions relevant to this litigation occurred, Regulation J said, in part:A Federal Reserve Bank will act only as the agent of the sender in respect of each cash item or noncash item received by it from the sender.... A Federal Reserve Bank will not act as the agent or the subagent of any owner or holder of any such item other than the sender. A Federal Reserve Bank shall not have, nor will it assume, any liability to the sender in respect of any such item and its proceeds except for its own lack of good faith or failure to exercise ordinary care.
 
 
 43
 12 C.F.R. Sec. 210.6(a) (1977) (footnote omitted), J.App. at 528. In so restricting the potential liability of the Federal Reserve Banks with "the sender rule," the regulations also provided: "The term 'sender,' in respect of an item, means a member bank, a nonmember clearing bank, a Federal Reserve Bank, an international organization, or a foreign correspondent." 12 C.F.R. Sec. 210.2(e) (1977), J.App. at 525. The appellants do not and cannot claim to be "senders" under Regulation J. They simply do not fall within the definition of section 210.2(e).
 
 
 44
 The application of Regulation J to this case is straightforward. The appellants' cause of action against Fed NY is based entirely on the theory that Fed NY breached duties required of it as an agent of the appellants in the check collection process. Regulation J unambiguously "severs the agency relationship" between Fed NY and the "non-sender" appellants. See Childs, 719 F.2d at 814. Because Regulation J requires that Fed NY not be considered an agent of the appellants, Fed NY cannot be found to have owed the appellants any duty under N.Y.U.C.C. Secs. 4-201 and 4-202.
 
 
 45
 The appellants claim that, properly interpreted, Regulation J merely defines the extent of agency of Federal Reserve Banks and does not limit their liability based on the duty of ordinary care. But the sole basis for liability on the part of Fed NY in this case is agency. Without a duty based on agency, there is no liability. See Childs, 719 F.2d at 814.
 
 
 46
 We believe that this case reveals no basic inconsistency between federal Regulation J and the New York Uniform Commercial Code. While N.Y.U.C.C. Secs. 4-201 and 4-202 might suggest a basis for liability here, the New York U.C.C. also provides that: "The effect of the[se] provisions ... may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care." N.Y.U.C.C. Sec. 4-103(1) (McKinney 1964). The reference to "agreement" is further clarified: "Federal Reserve regulations and operating letters, clearing house rules, and the like, have the effect of agreements under subsection (1), whether or not specifically assented to by all parties interested in items handled." N.Y.U.C.C. Sec. 4-103(2). Thus, "[b]y its own terms," New York law provides that Regulation J is to control the rights and duties of the parties here. See Appliance Buyers Credit Corp. v. Prospect National Bank, 505 F.Supp. 163, 164 (C.D.Ill.1981), aff'd, 708 F.2d 290 (7th Cir.1983); see also Coldwell testimony at 117, J.App. at 951 ("The Uniform Commercial Code permits the regulations of the Board and the operating circulars of the Federal Reserve Banks to govern many of the terms and conditions for collection of checks."). By operation of Regulation J and notwithstanding the non-assent of the appellants, the depositary banks and Fed NY agreed to vary the U.C.C. provisions applicable to this case, providing that Fed NY was to act as an agent only of "senders." Fed NY's duty of ordinary care simply did not extend to the appellants, see Carson, 172 N.E. at 479, and thus there can be no liability under sections 4-201 and 4-202(1)(a). Nor does the limitation in section 4-103(1) of a bank's power to disclaim the duty of ordinary care aid the appellants. Because Fed NY was not an agent of the appellants, there existed no such duty to be disclaimed.
 
 
 47
 We note that even if Regulation J were not consistent with New York law here, Regulation J would preempt the inconsistent state law provisions that might otherwise provide for agency liability on the part of Fed NY. As one district court has said in examining the interplay between U.C.C. Secs. 4-201, 4-202 and Regulation J:The provisions are in conformity when the sender of an item is also its owner; however, when the owner is a remote party, the provisions are in direct conflict. The Reserve bank is either liable to parties more remote than the sender or is not; it cannot be both. Since in this case simultaneous compliance with the federal regulation and the state statute is impossible, the federal law prevails.
 
 
 48
 Colonial Cadillac, Inc. v. Shawmut Merchants Bank, N.A., 488 F.Supp. 283, 286 (D.Mass.1980); see also Washington Petroleum and Supply, 629 F.Supp. at 1229-30.[3]
 
 
 49
 Faced with the clear application of Regulation J, the appellants complain of unfairness and predict calamitous consequences for the future of the transferability and negotiability of commercial paper. With respect to the latter concern, we note that Regulation J is not a recent innovation, see 14 Fed.Reserve Bull. 80 (1928); Carson, 172 N.E. 475 (1930), and thus far we see no evidence of such dire consequences. Moreover, this limitation of the liability of Federal Reserve Banks has long been supported by sound federal policy. In establishing the Federal Reserve System, Congress showed concern for the nation's costly and circuitous check processing system. Consistent with its goal of creating an equitable and efficient system of exchange, Congress provided for the Federal Reserve to serve as a national clearinghouse for checks. See H.R.Rep. No. 69, 63rd Cong., 1st Sess. 55-56 (1913); S.Rep. No. 133, 63rd Cong., 1st Sess., pt. 2, at 27 (1913). Soon after its creation, a major concern of the Federal Reserve was to implement federal policy by addressing the check collection problem. See W.P.G. Harding, The Formative Period of the Federal Reserve System 38-39, 49-60 (1925). Through their regulatory authority, the Governors of the Federal Reserve sought to establish and maintain "a direct, expeditious, and economical system of check collection and settlement of balances." See Carson, 172 N.E. at 478 (quoting Regulation J (series of 1924)); 14 Fed.Reserve Bull. 80; 2 Fed.Reserve Bull. 259 (1916). Regulation J was an early tool in this endeavor. See 14 Fed.Reserve Bull. 80. As noted supra, until the enactment of the Monetary Control Act of 1980, check clearing services were provided by Federal Reserve Banks free of charge to member banks in order to ease the burden of Federal Reserve membership. See Coldwell testimony at 120-21, J.App. at 954-55. As Fed NY explains: "The sender rule [of Regulation J] was a natural complement to the gratuitous service, because it effectively limited the Reserve Bank's duty to exercise ordinary care to only those institutions who were receiving the gratuitous service, thereby reducing losses as well as the overall cost of the service." Br. of Defendants-Appellees at 24.
 
 
 50
 This understanding of the policy behind Regulation J finds support in recent changes in the Federal Reserve System. It appears that the Monetary Control Act of 1980 was designed in part to improve the efficiency of the Federal Reserve System and promote competition by other banks and check clearinghouses. See Bank Stationers Ass'n v. Board of Governors, 704 F.2d 1233, 1236 (11th Cir.1983); Subcomm. on Domestic Monetary Policy of the House of Representatives Comm. on Banking, Finance and Urban Affairs, 98th Cong., 2nd Sess., Report on the Role and Activities of the Federal Reserve System in the Nation's Check Clearing and Payments System 68-69 (Comm.Print 1984), J.App. 924, 925-26; see also Jet Courier Services, 713 F.2d at 1227 (Congress did not intend to protect competitive positions of private collection services). Such a change would undermine an existent "protectionist" policy that supports giving the Federal Reserve Banks the competitive advantage of limited liability under Regulation J. Accordingly, the Board of Governors, in 1986, amended Regulation J and repealed the sender rule in order to
 
 
 51
 [p]ermit the owner of a check or other item who is allegedly injured by a Reserve Bank's alleged failure to exercise ordinary care or act in good faith in collecting an item to bring an action against the Reserve Bank, regardless of whether that person is a "sender" as defined in Regulation J.
 
 
 52
 51 Fed.Reg. 21740 (June 16, 1986), J.App. at 557.
 
 
 53
 Nevertheless, this change in the law came too late to aid the appellants, whose complaint and supporting evidence must be governed by the law in place in November of 1977. Under that law, Fed NY and its Branch Manager Keane breached no duty to the appellants in this case.
 
 4. Summary
 
 54
 The district court reviewed the appellants' complaint and the voluminous record and properly found that Regulation J precludes recovery against the appellees. The appellants had far more than ample time to conduct discovery and to formulate and present a meritorious cause of action against the appellees. Because the appellants have failed to do so, none of the factual disputes in the record are material, and the appellees are entitled to judgment as a matter of law.
 
 B. Discovery Issues
 
 55
 The appellants also base their challenge to the grant of summary judgment on their allegations that (1) Fed NY improperly withheld documents in discovery that were subsequently submitted in support of the summary judgment motion, and (2) there were material differences between witness' deposition testimony and affidavits supporting the summary judgment motion. These arguments were made to the district court in detail, see J.App. at 1063-70, and the district court rejected them, see J.App. at 1521 & nn. 8 & 9. We see no abuse of discretion in the district court's rulings. See Belfiore v. New York Times Co., 826 F.2d 177, 183-84 (2d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1030, 98 L.Ed.2d 994 (1988).
 
 CONCLUSION
 
 56
 The judgment of the district court following an order granting the motion of the defendants-appellees Fed NY and John T. Keane for summary judgment and dismissing the complaint is affirmed.
 
 
 
 [1]
 In accepting the dates offered by Fed NY, the district court rejected plaintiffs' counsel's argument that these dates were incorrect. Plaintiffs' counsel asked for and was given permission to file a compilation of his version of the dates Fed NY received the checks, but counsel did not do so. In this appeal, the appellants now offer such a compilation, maintaining, essentially, that most of the checks were received one day earlier than Fed NY contends. Fed NY asks us not to consider this showing, arguing that it cannot properly be considered part of the record
 In view of our disposition of this case, see infra, this factual dispute is immaterial, and therefore it does not affect the propriety of the granting of summary judgment.
 
 
 [2]
 These disputed facts might be relevant to issues of causation, but again, see n. 1 supra, this dispute is immaterial in light of our analysis of the governing law, see infra
 
 
 [3]
 Because the appellants' cause of action against Fed NY and Keane is based entirely on an agency theory under N.Y.U.C.C. Secs. 4-201 and 4-202(1)(a), we need not consider whether other state law causes of action would be preempted by Regulation J. See Colonial Cadillac, 488 F.Supp. at 286 (finding claim based on state consumer protection law preempted)