**COASTAL TANK LINES, INC.,**
**Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

**No. 81–3292.**

United States Court of Appeals,
Sixth Circuit.

Argued June 18, 1982.

Decided Sept. 8, 1982.

Edward J. Kiley, Robert R. Harris, Grove, Jaskiewicz, Gilliam & Cobert, Washington, D. C., for petitioner.

Linda J. Joachim, I. C. C., Robert B. Nicholson, Marion L. Jetton, U. S. Dept. of Justice, Washington, D. C., for respondents.

Before LIVELY and JONES, Circuit Judges, and CECIL, Senior Circuit Judge.

LIVELY, Circuit Judge.

This appeal raises important questions under the Motor Carrier Act of 1980, P.L. 96–296, 49 U.S.C. § 10101, et seq. (the 1980 Act). Reference is made to the opinion in *American Trucking Associations, Inc. v. Interstate Commerce Commission*, 659 F.2d 452 (5th Cir. 1981), where Judge Alvin B. Rubin set forth in detail a discussion of legislative background and an analysis of the Act. In brief, Section 2 states that the purpose of the Act is to carry forward the continuing efforts by Congress to reduce unnecessary federal regulation. Section 3 presents congressional findings that in certain instances the previous regulatory structure of the motor carrier industry has tended to inhibit market entry, carrier growth and maximum utilization of equipment and facilities, and that protective regulation has resulted in some operating inefficiencies and anti-competitive pricing. Section 4 of the Act amends the National Transportation Policy by substituting for a previous section a somewhat different statement of policy with respect to the transportation of property by motor carriers. The issues presented in this case require application of some of the provisions of Section 5(a) of the Act, 49 U.S.C. § 10922 (1982 U.S.C.A. pamphlet),[1] which concerns "motor carrier entry policy."

I.

On October 2, 1980 Florida Rock & Tank Lines, Inc. (F.R.&T.) filed an application with the Interstate Commerce Commission (the Commission) in which it sought authority to transport as a common carrier by motor vehicle "(A) commodities in bulk between points in the United States; and (B) commodities in dump vehicles between points in the United States." At the time of its application F.R.&T. was operating under 135 separate grants of permanent ICC authority, involving 51 commodities and 14 states. Between 1965 and 1980 F.R.&T. had also filed 142 emergency tem-

---

1. The portion of Section 5(a) with which we are primarily concerned provides:

> (b)(1) Except as provided in this section, the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title as a motor common carrier of property if the Commission finds—
>
> (A) that the person is fit, willing, and able to provide the transportation to be authorized by the certificate and to comply with this subtitle and regulations of the Commission; and

> (B) on the basis of evidence presented by persons supporting the issuance of the certificate, that the service proposed will serve a useful public purpose, responsive to a public demand or need;
>
> unless the Commission finds, on the basis of evidence presented by persons objecting to the issuance of a certificate, that the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity.
>
> 49 U.S.C. § 10922(b)(1).

porary authority applications involving 61 commodities and 15 states and 41 temporary authorities covering 35 commodities and 11 states. The authority sought in the October 2d application would permit F.R.&T. to provide transportation for all commodities in bulk and in dump vehicles between all points in the United States. This is known in the industry as nationwide "non-radial" authority. F.R.&T. filed with its application financial statements which showed that it had operated profitably in the past and had an equity in excess of $6,400,000 with no long-term debt.

At the time of its application F.R.&T. operated primarily in the southeastern United States. It had seven tank terminals, five in Florida and two in Georgia, and five dump terminals, all in Florida. It maintained and operated a total fleet of 374 tractors and 428 trailers. Under its existing authority, F.R.&T. was involved in some transportation to points as far north and west as New Jersey, Wisconsin and Texas. Characterizing its application as a consolidation of existing authority,[2] F.R.&T. asserted that the following benefits would result from certification:

> This application, if granted, would result in increased facility in the interpretation of our authority and service by us and our shippers; simplification and consolidation of multiple tariffs; energy conservation; reduction of empty miles; elimination of plantsite restrictions, one-way authorities, interlining and tacking restrictions, and narrow commodity descriptions; elimination of the necessity of filing multiple individual future applications as shippers and traffic needs are ascertained; and a concomitant reduction in the Commission's work load in processing, interpreting and enforcing existing and future authorities.

The application was supported by verified certifications from 20 shippers. Six shippers, all large, well-known companies, supported certification for the entire United States. One shipper, DuPont, supported certification for the United States in and east of a line running from North Dakota through South Dakota, Nebraska, Kansas, Oklahoma and Texas. The remaining 13 shippers supported certification in a total of 24 individual states, with only one favoring extension of authority west of the Rockies, and that to California only. Collectively, the supporting shippers required transportation of an extremely wide range of commodities hauled in bulk and dump vehicles. All of the supporting shippers expressed a desire for a wider choice in the selection of carriers and several complained of inadequate and unreliable rail service and the inefficiencies of fragmented existing motor carrier service. All supporting shippers who had used F.R.&T. in the past expressed their satisfaction with its service.

A total of ten carriers opposed F.R.&T.'s application. The present petitioner, Coastal Tank Lines, Inc. (Coastal), protested largely on the ground that increased authority to F.R.&T. would result in a loss of business and increased deadhead mileage by Coastal. Coastal took the position that the equipment and facilities owned by F.R.&T. were not sufficient to enable it to provide nationwide service. Coastal also noted that the supporting shippers were concentrated in the southeastern United States and thus did not demonstrate a need for the vast expansion of authority sought by F.R.&T. F.R.&T. responded specifically to the protests and arguments of Coastal and the other protesting carriers, pointing out particularly that none of the protestants competed with F.R.&T. on a regular basis in any geographic area.

### II.

On February 11, 1981 the Commission issued a decision, through Review Board No. 3, granting the application. Coastal

---

**2.** The Commission has indicated a willingness to grant a single certificate of operating authority to a carrier who presently possesses numerous fragmented authority, without evidence from supporting shippers. *See* Ex Parte No. 55 (Sub-No. 43), reprinted in 45 Fed.Reg. 86771 (Dec. 31, 1980). The Commission did not rely on the "consolidation" concept in approving the application under review here, and we express no view on such a policy.

and six other protesting carriers filed an administrative appeal in which they criticized Review Board No. 3 for not analyzing F.R.&T.'s fitness and in which they argued that the Board had not thoroughly reviewed the statements of supporting shippers. F.R.&T. filed a reply statement in which it asserted that its application had presented a prima facie case of need which had not been rebutted by the protestants. On April 14, 1981 the Commission, through Division 2, acting as an appellate division, denied the appeals. It held that "the findings of Review Board Number 3 are in accordance with the evidence and the applicable law." One of the protesting carriers sought a discretionary appeal before the full Commission, but it was denied. Judicial review in this court was sought by Coastal only.

The decision of Review Board No. 3, which became the final decision of the Commission, is relatively brief. After listing the 20 supporting shippers and the states supported by each, the decision summarizes the support as follows:

The 20 supporting shippers, taken together, ship almost every conceivable commodity that is customarily transported either (1) in bulk, or (2) in dump vehicles. Their shipping patterns, taken together, cover the entire United States. The volume of their subject traffic is considerable. They are dissatisfied with the operations of presently authorized carriers for several reasons: rail delivery is often too slow; no presently authorized motor carrier holds the broad authority sought by applicant; presently authorized carriers have been unable, in the past, to react, in a timely manner, to emergency transportation needs; and because there is today an insufficient supply of bulk equipment available to service the high volume need of specialized equipment. The supporting shippers urge our approval of this application in the public interest.

The decision then discusses the protesting carriers, noting that their authority is severely fragmented with respect to territories and commodities. Specific arguments of several of the protestants are mentioned individually. The Commission notes that all of the protestants assert that the support for F.R.&T.'s application was rather minimal and that existing service is adequate to meet the need of all of the supporting shippers. The decision concludes with the following analysis and finding:

A need has been shown for the operations described in the appendix to this decision. Applicant has established that it is fit, willing, and able to provide the proposed service, and it has shown that a public need exists for this service. The supporting witnesses have testified to the movement of a wide range, and a substantial volume of the subject commodities, and we are convinced that the public requires the service of an additional carrier. While protestants argue that the shippers have not clearly identified the volume of traffic to be tendered to applicant, we are of the opinion that the supporting witnesses have sufficiently met their burden of proof and that a representative need has been shown for a grant of all of the authority sought. The traffic appears substantial enough to permit both applicant and the protestants to compete for it, and we believe that the authorization of additional motor carrier service is warranted so that shippers moving freight within the scope of the application will not have to rely on the fragmented authority of the protestants. Finally, we note that none of the protestants has established with the desirable degree of specificity that authorization of additional competitive service will harm them in a manner inconsistent with the public convenience and necessity. Any ill effects which may be suffered by protestants as a result of our action here are more than outweighed by the benefits which are expected to accrue to the shipping, receiving, and consuming public. Indeed, if protestants find themselves losing freight or with idle equipment, they should be able to adjust the attractiveness of their service, or rates, or both, to remain competitive.

\* \* \* \* \* \*

*We find:*

Performance by applicant of the service described in the appendix will serve a useful public purpose, responsive to a public demand or need. Applicant is fit, willing, and able properly to perform the granted service and to conform to the requirements of Title 49, Subtitle IV, U.S. Code, and the Commission's regulations. An appropriate certificate should be granted. This action will not significantly affect the quality of the human environment or conservation of energy resources.

## III.

### A.

Under the 1980 Act the Commission "shall" issue a certificate to an applicant if it finds—

(A) that the person is fit, willing, and able to provide the transportation to be authorized by the certificate and to comply with this subtitle and regulations of the Commission; and

(B) on the basis of evidence presented by persons supporting the issuance of the certificate, that the service proposed will serve a useful public purpose, responsive to a public demand or need;

unless the Commission finds, on the basis of evidence presented by persons objecting to the issuance of a certificate, that the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity.

49 U.S.C. § 10922(b)(1). Coastal maintains that neither of these required findings is based on substantial evidence in the present case. It also contends that the Commission's "*pro forma* statutory finding of fitness" without any articulation of the basis for its conclusion is legally insufficient. Coastal argues as well that the Commission failed to analyze the statements of supporting shippers, most of which Coastal characterizes as "so vague and ambiguous that they hardly comprise probative evidence of public demand or need for any authority."

Underlying all of Coastal's arguments is the contention that the Commission has gone overboard in interpreting the 1980 Act. It is Coastal's view, that in its eagerness to demonstrate its own acceptance of deregulation, the Commission has overlooked the fact that an applicant under the 1980 Act still has the burden of proving its fitness and the existence of a public need.

### B.

The Commission responds that F.R.&T. made a prima facie case of need for the authority it sought and that the burden then shifted to the protestants to show that the authorization sought was "inconsistent with the public convenience and necessity." 49 U.S.C. § 10922(b)(1). The objecting carriers failed to prove that there would be any competitive injury to them, in the view of the Commission. Since the prima facie case of need was not rebutted, the Commission argues that its finding on this issue may not be overturned. In this respect the Commission emphasizes the fact that the protestants have had virtually no contact with the supporting shippers.

With respect to fitness, ability and willingness, the Commission asserts that Coastal misconstrues the meaning of these requirements. The Commission finds it immaterial that F.R.&T. did not have, at the time of the application, the facilities and equipment which would be required to serve all possible customers who might call upon it for transportation under the expanded authority. Emphasizing F.R.&T.'s sound financial condition and its previous record of satisfactory service, the Commission avers it is a reasonable conclusion that F.R.&T. will be able to make the necessary arrangements to offer the broadened service. The Commission points out that the fitness requirement has never meant that a carrier applying for a particular authority must upgrade its facilities and equipment prior to certification so as to be in a position to serve every conceivable customer under the authority on a single day. Fitness is determined on the basis of known facts and a reasonable prediction with respect to future performance.

All of the Commission's arguments are undergirded with the basic assumption that the 1980 Act requires a more lenient approach to applications than was required under previous legislation. It takes the position that the stated purpose of the 1980 Act "to reduce unnecessary regulation by the Federal Government" has been its guidepost in this and other recent cases. Thus the Commission argues that many of the pre-1980 Act cases relied upon by Coastal are irrelevant to our inquiry. It also stresses the narrowness of the scope of review of decisions granting motor carrier authority.

### IV.

#### A.

Though the decision in *American Trucking Associations, Inc. v. I.C.C., supra,* is not controlling, its treatment of the 1980 Act is quite helpful. There the court was concerned with two promulgations issued by the Commission—one a policy statement dealing with the grants of operating authority to new applicants and the other a set of rules and a policy statement dealing with the removal of restrictions under existing operating authorities. These actions of the Commission were challenged by a trade association, a union and a number of trucking firms. No ruling on a specific application for authority was involved in the case.

As the court pointed out in *American Trucking Associations,* the licensing requirements were amended by the 1980 Act to make it easier for new trucking companies to enter the market. Nevertheless, the "traditional test" of fitness, willingness and ability was deliberately retained. 659 F.2d at 469, quoting H.R.Rep. No. 96–1069, 96th Cong. 2d Sess., reprinted in [1980] U.S.Code Cong. & Ad.News 2283, 2296. The entry policy was altered in the 1980 Act only by making it easier for an applicant to establish public need. Once a prima facie showing has been made that proposed authority will serve "a useful public purpose, responsive to a public demand or need," the burden shifts to the objectors to show that the service proposed is "inconsistent with public convenience and necessity." *Id.* (footnote references to 49 U.S.C. § 10922(b)(1) omitted). The court found that the Commission's regulatory promulgations exceeded the statutory directions for relaxing federal regulation of the trucking industry. Nevertheless, it rejected an argument put forward by those opposing the Commission's "New Certificates Statement" that the Commission "must examine each application minutely and grant only to the actual extent of support given." The court agreed with the Commission that this view would limit too narrowly the evidentiary basis upon which it could grant authority. The court defined the Commission's task as follows:

> The statute does not limit it merely to considering and granting authorities based on shipper support or presently moving traffic. Just as in the past, it may consider other evidence, such as traffic studies or anticipated future movements. *Id.* at 86,799–86,800. The Commission must consider all evidence in light of a number of factors, most notably those in the national transportation policy. 49 U.S.C. § 10101(a)(7). Therefore, in considering each application, it must weigh, when applicable, "a need or demand for new services, innovative quality or price options, increased competition, greater fuel efficiency, improved service for small communities, improved opportunities for minorities, and any other benefits that would serve a useful purpose." H.R.Rep.No. 1069, *supra* note 13, at 15, *reprinted in* [1980] U.S.Code Cong. & Ad.News, at 2297. Shipper support is only part of a schematic representation that can evince a public purpose sufficient to justify a grant of new authority. Other evidence must be considered, and grants broader than existing shipper needs may be made.

*Id.* at 474–75.

#### B.

Judicial review of Commission decisions is governed by the Administrative Procedure

Act, which allows a court to set aside an agency decision upon specified grounds only. Among these grounds are that the agency's action, findings and conclusions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that such action, findings and conclusions are "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A) and (E) (1976); *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Ben Ruegsegger Trucking Service, Inc. v. I.C.C.,* 600 F.2d 591 (6th Cir. 1979).

A more complete statement by the Commission of the bases for its ultimate findings in the present case would have been helpful. We recognize the specialized skills which the Commission has acquired from its experience in the field of motor vehicle transportation, and we accord it due deference. The Commission's cursory treatment of the record in its decision has required this court to search the record for assurance that the findings of the Commission are supported by substantial evidence. A remand is not required when the record evidence is found sufficient, though the reviewing court should be directed to that evidence by the administrative decision. *Cf. Star Delivery Transfer v. United States,* 659 F.2d 81 (7th Cir. 1981).

 An administrative decision may be overturned even though it is supported by substantial evidence if it reflects arbitrary and capricious action. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *O-J Transport Co. v. United States,* 536 F.2d 126, 129–30 (6th Cir.), *cert. denied,* 429 U.S. 960, 97 S.Ct. 386, 50 L.Ed.2d 328 (1976). The decision must provide a reviewing court with a basis for determining whether the agency exercised its discretion properly. An agency's action "cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order . . . . There must be such a responsible finding." *S.E.C. v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). Nevertheless, the scope of review under the arbitrary and capricious standard

of the Administrative Procedure Act is narrow, and a court may not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The interplay between agency and court was described by Justice Douglas as follows:

> The agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 [83 S.Ct. 239, 246, 9 L.Ed.2d 207] (1962). While we may not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Chenery Corp.,* 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995] (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595 [65 S.Ct. 829, 836, 89 L.Ed. 1206] (1945).

*Bowman Transportation, Inc., supra,* 419 U.S. at 285–86, 95 S.Ct. at 441–42.

### C.

The first question for the court in the present case is to determine whether the Commission gave a "reasoned basis" for its action in approving F.R.&T.'s application. In making this determination we are not required to accept appellate counsel's *post hoc* rationalizations for agency action. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). There must be in the decision itself some "analysis . . . to justify the choice made" and some "indication of the basis on which the Commission exercised its expert discretion." *Id.* at 167, 83 S.Ct. at 245. *See also Argo-Collier Truck Lines Corp. v. United States,* 611 F.2d 149, 152–53 (6th Cir. 1979); *ASG Industries, Inc. v. United States,* 548 F.2d 147, 154–55 (6th Cir. 1977).

### V.

### A.

 The decision of the Commission deals with the public need requirement of § 10922 by summarizing the contents of the

20 shipper support certificates which F.R.&T. filed with its application. The Commission adopted the groupings of these certificates suggested by F.R.&T. From this fact Coastal argues that the Commission failed to examine the support certificates carefully and based its conclusion of need on F.R.&T.'s recapitulation of them. The decision itself fails to support this claim. The language from the Commission's decision quoted earlier in this opinion discloses a familiarity with the nature of the commodities involved in the supporting shippers' transportation needs, their shipping patterns and the reasons for their dissatisfaction with presently available carriers. We find that the "agency's path may reasonably be discerned." *Bowman Transportation, Inc., supra,* 419 U.S. at 286, 95 S.Ct. at 442. The finding that need exists for the authority sought by F.R.&T. is not arbitrary or capricious, since a reasoned basis for the finding is disclosed in the decision itself.

We also conclude that there is substantial evidence in the record which supports the finding of need. In the aggregate the supporting shippers constitute a cross section of American industry. While these shippers by no means guaranteed F.R.&T. a steady flow of business throughout the United States, taken together, their certifications established the existence of a substantial demand for service not then being provided by any single carrier. The supporting certifications are not as specific in some respects as might be desired, but they do contain evidence of dissatisfaction with nationwide service by several shippers whose operations are national in scope. Nor has Coastal shown that it would be significantly harmed by the grant of authority. "The weighing of the evidence and the drawing of inferences and conclusions from it are the function of the ICC alone . . . ." *Bloomer Shippers Ass'n v. I.C.C.,* 679 F.2d 668, 672 (7th Cir. 1982). We cannot conclude that the finding of public need is unsupported by substantial evidence.

### B.

■ Counsel argues that the Commission found F.R.&T. "fit, willing and able" on the basis of its satisfactory past performance and its strong financial position. However, there is no discussion of the requirement in the decision, merely the flat statement, "Applicant has established that it is fit, willing and able to provide the proposed service . . . ." Since Congress saw fit to retain this requirement the Commission was bound to treat it with some degree of care. *Cf. Steere Tank Lines v. I.C.C.,* 666 F.2d 255, 258 (5th Cir. 1982); *American Trucking Associations, supra,* 659 F.2d at 469. The protestants specifically relied upon the fact that all of F.R.&T.'s terminal facilities were located in Florida and Georgia and that its existing patterns of hauling were limited largely to the southeastern United States. The Commission neither answered these objections nor explained its conclusion that F.R.&T. is fit, willing and able to provide satisfactory service throughout the United States.

The Supreme Court has stated that "the courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review." *S.E.C. v. Chenery Corp., supra,* 318 U.S. at 94, 63 S.Ct. at 462. The Administrative Procedure Act will not permit a court to accept an agency practice of issuing adjudicatory decisions which contain "no analysis . . . to justify the choice made, [and] no indication of the basis on which the Commission exercised its expert discretion." *Burlington Truck Lines v. United States, supra,* 371 U.S. at 167, 83 S.Ct. at 245. The finding that F.R.&T. is fit, willing and able suffers from precisely these deficiencies. Under these circumstances we have no choice but to hold that this finding is arbitrary and capricious and to remand for compliance with settled legal requirements.

The decision of the Commission is vacated and the cause is remanded for further proceedings.