**FIRST BANK & TRUST COMPANY, Plaintiff,**

**v.**

**BOARD OF GOVERNORS OF FEDERAL RESERVE SYSTEM, Defendant.**

**Civ. A. No. 81–38.**

United States District Court, E.D. Kentucky, Catlettsburg Division.

Dec. 26, 1984.

Gillard B. Johnson, II, Ashland, Ky., James Park, Lexington, Ky., for plaintiff.

U.S. Atty., Louis DeFalaise, Lexington, Ky., James V. Mattingly, Jr., Associate General Counsel, Board of Governors of Federal Reserve System, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

WILHOIT, District Judge.

This action is before the Court on objections to the Magistrate's Report and Recommendation (the "Report") that declared portions of the Monetary Control Act of 1980 (MCA), as originally enacted, to be unconstitutional by virtue of the Fifth Amendment's due process clause, although the Report upheld the constitutionality of the MCA as it was amended in 1982. The Board of Governors of the Federal Reserve (the "Board") filed objections to the Report, to which First Bank & Trust Company ("First Bank"), the plaintiff herein, responded. The Board has replied to bank's response, and the matter is, therefore, fully submitted to this Court.

### I. FACTS

This action concerns the validity of the MCA of 1980, and as amended in 1982. In its pertinent parts, the MCA extended reserve [1] requirements to all banks in the United States whether the bank was a

---

1. "Reserves" refers to the percentage of deposits that a bank must, by law, keep either as vault cash or in non-interest bearing accounts at the Regional Federal Reserve Bank. See 12 C.F.R. § 204.3(b) (1983).

member of the Federal Reserve System or not. Prior to 1980, a dual system of reserve requirements for banks was in existence. Banks that were members of the Federal Reserve were required to post reserves in accordance with the regulations of the Board. Banks not a member of the Federal Reserve could keep reserves in accordance with state banking laws. All nationally chartered banks are required to be members of the Federal Reserve and comply with its reserve requirements. State-chartered banks could be members of the Federal Reserve, but if they were not, they did not have to comply with the Board's reserve requirements.

This dual system has been in existence for some time. In recent years it began to be unprofitable for many banks to maintain membership in the Federal Reserve System because of the relatively high cost of services provided by the Federal Reserve, and more importantly, because of the growing loss of profits occasioned by Federal Reserve's relatively high percentage of required reserves, many banks began to leave the System.

Prior to 1980, First Bank was a nationally chartered bank. Because of the greater amount of idle reserves it had to hold being a member of the Federal Reserve, First Bank's Board of Directors in 1979, decided to withdraw from the System and seek a state charter. The bank's shareholders approved the Board of Director's decision on February 26, 1980. A state charter was obtained March 3, 1980, and on the same day, the Bank withdrew its reserve balances from the Federal Reserve Bank of Cleveland, relinquishing its stock in the system.

The rising tide of "bank flight" from the Federal Reserve System did not escape Congress' attention. Indeed, in 1979, at least five bills appeared in Congress aimed at correcting the Federal Reserve's growing lack of control over the money supply.

Many of the proposed bills imposed mandatory reserve requirements for all banks including non-member banks. On November 1, 1979, however, the Senate passed S. 1347 with an amendment removing manda-

tory reserve requirements. The House had already approved legislation that did not require mandatory reserves for non-member banks. Therefore as of November 1, 1979, it appeared Congress would not pass legislation mandating reserves requirements for all banks.

Newsletters in the banking industry were circulated assuring bankers that Congress would not legislate mandatory reserve requirements because both houses had approved legislation without such a requirement. The news that Congress would not impose mandatory reserves reached the Board of Directors of First Bank and was one of the precipitating factors in its decision to withdraw from the Federal Reserve System.

The Conference Committee Report of the MCA, which was rendered on March 21, 1980, and which includes the provisions under dispute in this lawsuit, re-imposed mandatory reserve requirements. The Conference Report was approved by both houses of Congress and signed into law by President Carter on March 31, 1980.

The pertinent provisions of the MCA, as finally passed and signed by the President, provide that non-member banks shall be allowed an eight-year phase-in of the mandatory reserve requirements. Member banks, however, were not given any phase-in period and had to maintain reserves in accordance with federal regulations as always.

Under regulations promulgated by the Board shortly after the MCA was passed, a bank that was formerly a member but had withdrawn, must have taken some unambiguous, irrevocable action toward withdrawal before July 1, 1979 to be eligible for the eight-year phase-in program. The regulations further provided that the Board may extend the time for posting reserves in "hardship" cases. These regulations, however, were promulgated without notice or comment as laid out in the procedures, of 5 U.S.C. § 553(b).

On June 13, 1980, First Bank petitioned the Board for a determination that it had

withdrawn from membership prior to July 1, 1979. On July 19th, the bank petitioned a second time seeking in the alternative a determination that the financial hardship exception as laid out in the regulations was applicable to it. Both petitions were denied on September 26, 1980: the first, for the reasons that the bank had not taken unambiguous, irrevocable steps to withdraw before July 1, 1979; and the second, for the reason that the bank's financial condition as of June 30, 1980 did not warrant application of the hardship exception. After the Board denied reconsideration of its decision, the bank posted its required reserve deposits in October 1980. In February 1981, First Bank brought this action seeking judicial review of the Board's decision under 5 U.S.C. §§ 701–06 and 12 U.S.C. § 632.

In October 1982, Congress passed the Garn-St. Germain Act amending the MCA. Congress recognized that the lack of any phase-in period for banks that had recently withdrawn from the Federal Reserve System could work an extreme hardship. The Garn-St. Germain amendments granted banks that had withdrawn between July 1, 1979 and March 31, 1980 a limited phase-in period.

This matter was referred to the United States Magistrate for a Report and Recommendation, see 28 U.S.C. § 636(b)(1)(B), after the defendants moved to dismiss or in the alternative for summary judgment and the plaintiff responded and cross-moved for summary judgment. The Court agrees with most of the Magistrate's Report and adopts portions of the Report herein as and for its own opinion.

II. DEFENDANT'S MOTION TO DISMISS; ACTION COMMITTED TO AGENCY DISCRETION WITHIN THE MEANING OF 5 U.S.C. SECTION 701(a)(2)

The basis of defendant's motion to dismiss is that matters now before the Court are committed to the Board's discretion and, hence, are excluded from judicial review according to 5 U.S.C. § 701(a).

The exception found in Section 701(a), however, is very narrow. *A–T–O, Inc. v. Pension Benefit Guaranty Corp.*, 634 F.2d 1013, 1019 (6th Cir.1980). Nonreviewability must be established by a clear showing of Congressional intent to preclude review. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); *Independent Bankers Assoc. of America v. Board of Governors of the Federal Reserve System*, 500 F.2d 812, 814 (D.C.Cir. 1974); *Cf. Olson v. U.S.*, 514 F.Supp. 355, 356 (W.D.Ky.1981). Further, the agency has the burden of demonstrating that its decision is insulated from review. *Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975).

No reported case seems to have dealt with the precise issue of whether Section 701 precludes review of the Board's actions under the MCA and related statutes. However, several suits challenging the Board's actions under other sections of the MCA have, in fact, been brought under the Administrative Procedure Act (APA). *Jet Courier Services, Inc. v. Federal Reserve Board of Atlanta*, 713 F.2d 1221 (6th Cir. 1983); *Bank Stationers Association v. Board of Governors of the Federal Reserve System*, 704 F.2d 1233 (11th Cir. 1983).

In *Jet Courier*, the Sixth Circuit apparently approved the idea of APA review of the Federal Reserve Board's actions under the Monetary Control Act of 1980 although it dismissed the case because of standing problems. *See Jet Courier, supra* at 1224.

The Board seeks to meet the burden of demonstrating that its decision is insulated from review merely by making general comments about the agency's discretion under "loose statutory terms". However, while an agency may retain the discretion to act, its actions may not be ones "committed to agency discretion by law" under Section 701. *Hondros v. United States Civil Rights Commission*, 720 F.2d 278, 292 (3d Cir.1983.) Under that section: (1) the agency must have broad discretionary pow-

ers, in the sense that there is almost no law to apply; (2) the actions must implicate political, economic, military or other choices not readily susceptible to judicial review; and (3) even those actions which are committed to the agency's discretion are reviewable on the ground that the decision violates a constitutional command. *Id.* at 293. Clearly, the Board has not established that any of these criteria have been met.

■ Therefore, Section 701 does not preclude judicial review of the present action and in that regard, defendant's motion to dismiss is denied.

## III. MOTIONS FOR SUMMARY JUDGMENT

### A. STANDARD OF REVIEW

The principles a court must apply in deciding a motion for summary judgment are well established. Under Rule 56 of the Federal Rules of Civil Procedure, the moving party has the burden of demonstrating the absence of a genuine issue of material fact and that he is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). The Court is not to resolve issues of fact, but rather determine whether there are any material issues of fact to be tried. *In Re: Atlas Concrete Pipe, Inc.*, 668 F.2d 905, 908 (6th Cir.1982). If a question of fact remains, the motion should be denied and the case should proceed to trial. *Id.* Finally, the case is to be viewed in the light most favorable to the party opposing the motion. *Lewis Refrigeration Co. v. Sawyer Fruit Vegetable and Cold Storage Co.*, 709 F.2d 427 (6th Cir.1983).

It is upon these standards that the cross-motions for summary judgment should be viewed. Under either party's analysis, this case involves the constitutional validity of statutory provisions, and the constitutional and statutory validity of administrative action. Thus, matters are appropriate for summary judgment.

The validity of the agency's determination that the Bank did not withdraw from membership prior to July 1, 1979 will be examined first, since an incorrect assessment of the plaintiff's status on this ground would allow the court to sidestep a decision on the constitutionality of the statutory provision itself.

### B. VALIDITY OF THE ADMINISTRATIVE REGULATIONS

The complaint asks the court to declare the Board's actions "in excess of ... statutory ... authority and in violation of the Constitution." This statement encompasses an attack on the validity of the regulations themselves quite apart from the constitutional challenge to the statute.

■ In determining the validity of administrative regulations, a three-prong test of inquiry is used. *Wayne State University v. Cleland*, 590 F.2d 627, 632 (6th Cir. 1978), citing *Overton Park*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136.

First, the regulations must be examined to see if they were promulgated in excess of statutory authority. *Wayne State*, 590 F.2d at 632. Like the statute and regulations at issue in *Wayne State*, the regulations here were *not* inconsistent with the statute; the Board was specifically empowered by the statute to promulgate all necessary regulations in implementing the mandatory reserve requirement and also to suspend reserve requirements on a purely temporary basis. Nor were the provisions so clear as to be in no further need of clarification; the meaning of the word "withdrawal" was not defined in the statute.

The second prong of the inquiry is whether the regulations are arbitrary, capricious or otherwise not in accordance with law. *Wayne State*, 590 F.2d at 633. Here, the court is not empowered to substitute its judgment for the administrator and the agency's action is entitled to a presumption of validity. *Id.* at 632. The regulations in the present case are not an arbitrary and capricious exercise of administrative authority. Rather, given the statute, they constitute an implementation of Congress' mandate to prescribe regulations

to effectuate the mandatory reserve system and ensure that it was not evaded.

The regulation concerning the withdrawal date mirrored the statutory provision concerning *state* banks (date of notification of the Board) but contained the provision that "clear evidence" of "an unambiguous irrevocable decision to withdraw" before that date would also be considered. This latter provision reflects legislative concern over the withdrawal date. 125 Cong.Rec., S. 3176 (daily ed. March 27, 1980).

The third prong of the test is the determination of whether appropriate procedures were followed in implementing the statute. *Wayne State,* 590 F.2d at 633. Notice and comment procedures to be followed by an administrative agency in rule making are found in 5 U.S.C. § 553(b) and (c). The parties to this action agree that no notice-and written-comment procedure was undertaken, but differ as to the effect flowing from this fact. The question is whether the regulations at issue are interpretive rules so as to fall within the exception to the requirement.

■ "Interpretive rules" is a term not defined by the APA. Case law, however, seems to define an interpretive rule as a clarification or explanation of an existing statute or rule. *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 908–09 (5th Cir.1983). Stated another way, these rules are an agency's construction of the existing laws it administers rather than a substantive modification of an existing regulation, announcing some new course of action. *Jean v. Nelson,* 711 F.2d 1455, 1478 (11th Cir.1983). They are not determinative of issues or rights addressed [but] express the agency's intended course of action, its tentative view of the meaning of a particular statutory term, or are internal housekeeping measures organizing agency activities; they do not foreclose alternative courses of action or conclusively affect rights of private parties. *Avoyelles Sportsmen's League,* 715 F.2d at 908–09, *quoting Batterton v. Marshall,* 648 F.2d 694 (D.C.Cir.1980).

■ On the other hand, substantive regulations, which *are* covered by the notice and comment procedures, are those issued by an agency pursuant to statutory authority and which actually implement the statute; there Congress entrusted to the agency, rather than the courts, the primary responsibility for interpreting the statutory term. *Batterton v. Francis,* 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977), (construing regulations issued pursuant to a statutory mandate). These rules grant rights, impose obligations, or produce other significant effects on private interests; they also narrowly constrict the discretion of agency officials by largely determining the issue addressed. *Avoyelles,* 715 F.2d at 908, quoting *Batterton,* 648 F.2d 694.

At least one Court of Appeals has held that rules may be characterized as legislative only if (1) Congress has delegated legislative power to the agency and (2) the agency intended to use that power in promulgating the rule, *American Postal Workers Union v. United States Postal Service,* 707 F.2d 548, 558–59 (D.C.Cir. 1983), but to most courts, the distinction between the two types of rules can be blurred. *Avoyelles,* 715 F.2d at 909, *quoting Batterton,* 648 F.2d at 702–03.

The particular rules issued in the present case were characterized as "interpretation[s]" by the agency in the press release accompanying their publication. However, the label that the particular agency places on its given exercise of administrative power is not conclusive. *Louisiana-Pacific Corp. v. Block,* 694 F.2d 1205, 1210 (9th Cir.1982); *Chamber of Commerce of the United States v. OSHA,* 636 F.2d 464, 468 (D.C.Cir.1980).

Therefore it is necessary to look at the regulation itself. In doing so, it is most clear that the regulation pertaining to "withdrawal" is an interpretive regulation in that it is a "necessary and appropriate guideline defining more precisely what "withdrawal" means in the statute. *See Woodard v. United States,* 725 F.2d 1072, 1076 (6th Cir.1984). It merely provides an

interpretative aid as to what a statutory term means, a term about which there could be considerable question.[2]

Therefore, the regulation was properly promulgated.

## C. THE BOARD'S ADJUDICATORY ACTION ON THE WITHDRAWAL ISSUE.

### 1. DID THE BOARD IMPROPERLY REFUSE TO CONDUCT A HEARING IN VIOLATION OF 5 U.S.C. SECTIONS 554 AND 557?

Plaintiff contends that the Board improperly failed and refused to conduct an adjudicatory proceeding in accordance with 5 U.S.C. §§ 554 and 557.

■ Certainly, the APA recognizes that a party is entitled to present its case either by oral or documentary evidence. *American Transfer & Storage Co. v. ICC*, 719 F.2d 1283, 1301 (5th Cir.1983). However, an agency is not *required* to provide oral hearings unless the statute governing the agency's actions makes an oral hearing mandatory. *Id.; Sealand Service, Inc. v. Federal Maritime Commission*, 653 F.2d 544, 551 n. 18 (D.C.Cir.1981). In this instance, no such statutory provision exists.

■ There is no general constitutional right to oral arguments before an administrative agency. *FCC v. WJR*, 337 U.S. 265, 274–77, 69 S.Ct. 1097, 1102–04, 93 L.Ed. 1353 (1949). An administrative agency has considerable discretion through its procedural rules as to how it wishes to structure the presentation of evidence; an oral hearing should not be required unless verified statements do not provide an ade-

quate basis for the resolution. *Laird v. ICC*, 691 F.2d 147, 154–55 (3d Cir.1982), *cert. denied*, 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 297. In this case, plaintiff was allowed to submit a lengthy, written petition (in excess of 120 pages including affidavits) on the issue. Subsequently, plaintiff was afforded another opportunity to submit facts on administrative appeal procedures, but confined itself to presentation of legal issues.

■ Moreover, due process does not require the Board to hold a hearing when the facts are not in dispute. *U.S. v. Cheramie Bo-Truc No. 5, Inc.*, 538 F.2d 696, 698 (5th Cir.1976). And, in the case of the petition before the Board, no facts were in dispute; the only question for determination, essentially, was whether the Board of Directors' adoption of a five year financial plan constituted an "unambiguous" decision to withdraw. This is, of course, a question of legal interpretation.

Therefore, no hearing was required.

### 2. DID THE BOARD'S DECISION VIOLATE THE STANDARDS SET OUT FOR JUDICIAL REVIEW UNDER THE APA?

Plaintiff contends that the Board's decision with respect to the petition concerning withdrawal from the System violated the standard set out in the judicial review sections of the APA, which provides in pertinent part:

> The reviewing court shall—...
>
> > (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

---

**2.** The Court has no occasion to address the interpretative or substantive nature of the Board's regulations setting up the so-called "hardship exception". The Court is aware that the Magistrate by way of dicta suggested the hardship exception regulation may be substantive, and hence not properly promulgated pursuant to the notice-and-comment procedures of 5 U.S.C. § 553. But, the Court fails to find any current controversy with respect to that regulation.

If this Court held the hardship exception was substantive, no benefit could possibly accrue to

the plaintiff bank. The bank was denied status under the hardship exception, and now the hardship exception regulations have been completely superseded by the Garn-St. Germain Amendment to the MCA. The regulation no longer exists, and if the Court declared it illegal during the two year period in which it existed, it could not be re-promulgated or otherwise applied to give the plaintiff any relief. In this posture, the Court views any controversy regarding the validity of the hardship exception regulation as moot.

(A) arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law....

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. 5 U.S.C. § 706.

■ Under the APA, an agency decision is entitled to a presumption of regularity, but the reviewing court must engage in an inquiry to determine whether the agency action was based on a consideration of the relevant factors and whether there has been a clear error of judgment; the ultimate standard of review is a narrow one. *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823; *Avoyelles,* 715 F.2d at 904; *Coastal Tank Lines v. Interstate Commerce Commission,* 690 F.2d 537 (6th Cir.1982).

The Board's stated reason for denying the first petition was that "there was no unambiguous irrevocable decision to withdraw from Federal Reserve membership before July 1, 1979." (Administrative Record (A.R. 188.) This standard was directly drawn from the regulations, which calls for "clear" evidence to be submitted on the matter. It was undisputed that the Board of Director's formal vote to withdraw (A.R. 118) and the effective date of the state charter (A.R. 18) occurred long *after* the date in question. The bank in its petition, however, urged that the adoption of the five-year business plan "incorporating the recommendation that the Federal Reserve membership be discontinued" by the Board of Directors satisfied the "unambiguous irrevocable" requirement. (A.R. 17–18.).

Unfortunately, the minutes for the meeting make no specific reference to the Reserve membership question (A.R. 64–65). Additionally, the record is replete with evidence from which it may be deduced that, although dropping the membership was much talked about at the bank, no firm and irrevocable decision was made until December, 1979. For example, in the affidavit of

David Trubica (Vice-President of Operations at the bank) it was stated that:

[O]n several occasions from mid-1978 through most of 1979 we met with various representatives of the Cincinnati office of the Federal Reserve on different matters and discussed specifically our bank's evaluation of its Fed membership. We made it clear during each discussion that *if* some relief was not granted by the Federal Reserve System for a bank of our size, we *would have* to drop membership." (A.R. 56.) (Emphasis added.)

Indeed, the Board postponed taking any action in anticipation of Congressional action on the matter, (Affidavit of Johnson A.R. 54), and it wasn't until December 14, 1979 that the Board voted to withdraw from membership. (A.R. 83.)

The minutes of the January 10, 1980 Executive Committee meeting reflected the fact that the bank did not perceive itself as out of the system as yet; chairman Johnson reported that:

It is just a matter of notice, that *we will be* out of the Federal Reserve System following approval by shareholders and obtaining the state charter and filing our charter in the county court. (A.R. 88.) (Emphasis added.)

Further, the letter going out to shareholders in January, 1980 stated:

The Directors have called a special meeting of the shareholders *to decide on their recommendation* that the bank withdraw from the Federal Reserve *System ... In order to* withdraw from the Federal Reserve System *we will,* subject to shareholders approval, be required to take these steps:

(1) Convert our Federal Charter to a State Charter ....

■ However, although there is substantial evidence for the agency's decision, an agency's action cannot be upheld merely because findings *might* have been made and considerations disclosed that would justify its order. *Coastal Tank Lines,* 690 F.2d at 543. The agency must have articulated a rational choice between the facts found and the choice made; *post*

*hoc* rationalizations are unacceptable. *Id.* The court cannot supply a reasoned basis for the agency's action that the agency itself did not give, although it may uphold a decision of less than ideal clarity if the agency's path can reasonably be discerned. In order to meet this standard, there must be in the decision some analysis to justify the choice made and some indication of the decision's basis. *Id.* The Legal Staff's report included in the Board record note that (1) minutes of the 1978 board meeting contains no reference to Federal Reserve membership, (2) that Bank of Ashland officers had *discussed* withdrawal from the System with Federal Reserve representatives, (3) the state charter did not predate July 1, 1979 and (4) the shareholders did not vote to convert to a national bank until after July 1, 1979, and (5) the Board of Directors vote to withdraw did not come until December, 1979. Clearly, these findings (undisputed by the Bank) are sufficient to justify the decision.

Thus, the Board's decision was rational and based on evidence in the record.

### D. CONSTITUTIONALITY OF THE STATUTE

In its complaint plaintiff seeks a declaration that 12 U.S.C. § 461(b)(8)(D)(i) violates its substantive due process rights as guaranteed by the Fifth Amendment of the Constitution.[3] Plaintiff contends that the MCA's original provisions violated its rights by providing no phase-in period for banks which had withdrawn from the Federal Reserve System after July 1, 1979; of particular concern was the fact that the date selected was almost nine months before the enactment of the original provision in the MCA. Additionally, at issue are the provisions as modified by the Garn-St. Germain Act.

It is well established that legislative acts adjusting the burden and benefits of economic life come to the court with a presumption of constitutionality. *Hodel v. Indiana*, 452 U.S. 314, 323, 101 S.Ct. 2376, 2382, 69 L.Ed.2d 40 (1981); *Richardson v. Secretary of Labor*, 689 F.2d 632, 633 (6th Cir.1981), *cert. denied*, 461 U.S. 928, 103 S.Ct. 2088, 77 L.Ed.2d 299. In areas of economic regulation, the courts have consistently deferred to legislative determinations as to the desirability of particular statutory discriminations. *Id.* Unless the classification trammels fundamental personal rights or is drawn on an inherently suspect classification, its constitutionality is presumed and the challenged classification need only be rationally related to a legitimate governmental interest. *Id.*[4]

This rational relationship test means that the court must defer to congressional judgment unless it is demonstrably arbitrary or irrational. *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 83–84, 98 S.Ct. 2620, 2635–36, 57 L.Ed.2d 595 (1977). Underinclusiveness alone does not make a legislative classification invalid. *Richardson*, 689 F.2d at 634.

However, this case involves not merely the questions of whether Congress could pass legislation concerning the reserve requirements in the Federal Reserve system or whether it could extend those requirements to non-member banks. Clearly, it has that authority consistent with the Constitution.[5]

At issue are the constitutional problems occasioned by the *retroactive application* of the statute in question. As the Supreme Court in *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16–17, 96 S.Ct. 2882, 2892–93, 49 L.Ed.2d 752 (1976), pointed out, it is not necessarily true that "what Congress can legislate prospectively, it can legislate

---

**3.** The Equal Protection clause of the Fourteenth Amendment is inapplicable to federal action as such. Nevertheless, grossly unreasonable action by the federal government violates the Due Process clause of the Fifth Amendment. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

**4.** In this case, it is conceded that no fundamental right or suspect classification is involved. (H. Tr. 8–9).

**5.** This was conceded by plaintiff. (H. Tr. 22).

retrospectively"; the retrospective aspects of legislation must also meet the due process test and what may justify law prospective in application may not suffice with a retroactive statute. The Magistrate's Report recommended the MCA, as passed in its original form, be found unconstitutional because of its retroactive effect. The Court does not agree.

In reaching his conclusion, the Magistrate relied on several cases which have been recently disapproved by the United States Supreme Court. *See Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* —— U.S. ——, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). The Magistrate relied and the parties focused their arguments on *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 592 F.2d 947 (7th Cir.1979), *aff'd on other grounds,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354. The four-pronged analysis of the constitutionality of retroactive legislation as laid out in the *Nachman* case was rejected in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co., supra* —— U.S. at —— n. 6, 104 S.Ct. at 2717 n. 6. Instead, the Supreme Court stated that the rational basis test is what should be applied to legislation that bears on the economic benefits and burdens of retroactive federal legislation. *See id.* —— U.S. at ——, 104 S.Ct. at 2718.

The Court assumes *arguendo* that the MCA, as originally enacted and amended, was retroactive in application although the Court realizes a substantial question is posed whether it is in fact retroactive. The Court finds, however, that even if it were said to be retroactive, there is a rational basis for its retrospective effect. This is all that is required for upholding the legislation under the Fifth Amendment's Due Process clause. *See id.*

It is clear from the legislative history behind the MCA that one of the principle purposes of the Act was to equalize the inequities between the amount of reserves required to be kept by non-member banks vis-a-vis member banks. In attempting to equalize these inequities, by establishing mandatory reserve requirements for all banks, Congress intended to curb the rising tide of bank flight from the Reserve System. Bank flight created what many, including Congress, perceived to be an alarming decrease in the amount of the nation's money supply directly controllable by the Federal Reserve Board. The equalization brought about by the MCA, albeit accomplished through a phase-in for non-member banks, has the effect of reducing the attractiveness for member banks to withdraw from the System. There is no longer any significant competitive advantage to be gained by forfeiting Reserve membership in favor of a state charter. With fewer banks, therefore, "fleeing" from the Reserve System, the Board is assured of not losing anymore control over the nation's money supply via its member banks.

Pursuant to the intent behind the MCA, it is clear Congress had a rational purpose in picking a date prior in time to the Act's enactment for determining which banks would be deemed member or non-member banks for purposes of the Act's phase-in provision. First of all, Congress wanted to curb bank flight and therefore was not going to reward banks that had recently withdrawn from the System in anticipation of Congress' imposing mandatory reserve requirements. More importantly, Congress wanted to equalize the inequitable differences in the amount of reserves required of member and non-member banks. Congress no longer wanted member banks to be at a competitive disadvantage with their non-member counterparts. At the same time, Congress did not want to impose mandatory reserves on non-member banks effective immediately without some transitional, phase-in provisions to ease the financial hardship that might be occasioned on non-member banks having to increase their required reserves. The phase-in provisions of the Act allow non-member banks the opportunity to gradually post the increased reserves required of them by the federal government.

Transitional, phase-in provisions are, of course, short term, anti-equalization measures. Moreover, equalization of the differ-

ing amounts of reserves required by federal and state regulations was one of the primary purposes of the Act. Consequently, Congress did not want to extend the transitional, phase-in provisions to any banks that did not need the benefit of the phase-in provisions. Indeed, within the overall intent of the Act, the phase-in provisions were tolerated *only* to ease the hardship that might otherwise be created for non-member banks that have never been subjected to federal reserve requirements.

Recently withdrawn banks—*i.e.* banks that have withdrawn from the Reserve within the past nine months—would not be significantly oppressed by immediately posting the mandatory reserves required of all banks under the Act. These banks, having recently been members of the Reserve, would not be as financially oppressed in posting reserves in amounts which they were required to keep when they were member banks. Certainly for them, putting up the reserves would not be as much of a hardship as it would be for banks that had never been required to keep such a level of reserves. Congress could, therefore, rationally conclude that banks which had been members of the Reserve as of July 1, 1979, approximately nine months before the MCA's enactment, should not benefit from the transitional, phase-in provisions.

Given this rationale for the legislative scheme, First Bank simply cannot point to any lack of a rational basis for the way in which the MCA, as originally enacted and/or as amended in 1982, attempts to impose mandatory reserve requirements on non-member banks. Congress rationally discriminated between recently withdrawn non-member banks and all other non-member banks. The rationale is, simply put, that recently withdrawn banks do not *need* the benefit of a phase-in while other non-member banks do. At the same time, Congress rationally chose to make the operative date in the Act nine months prior to its enactment. The rational basis for this is simply that it avoids extending the transitional, phase-in provisions to banks that really do not need it, at least they do not

need it to the extent other banks that had never been members may need it. *Cf. Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* —— U.S. at ——–——, 104 S.Ct. at 2717–19.

There is, therefore, no equal protection or retroactive (due process) problems with the MCA, either as originally enacted or amended. Although the Bank's complaint—that it has been inequitably treated vis-a-vis other *state* banks because it was not permitted a phase-in period for posting reserves while other state banks were permitted such a phase-in—is a compelling and logical argument the Court does not believe the argument raises a substantial constitutional question. There being a rational basis for requiring the Bank to post its reserves without a phase-in, the Court believes the argument is a matter best settled in the political arena. Indeed, it is for this reason the Court believes that the Board adopted the "hardship exception" in its regulations and that Congress later enacted the limited, phase-in provisions of the Garn-St. Germain Amendments of 1982.

Consequently, the Court refuses to adopt the Magistrate's report in this respect and agrees with the Board with regard to the validity of the MCA and the regulatory scheme promulgated pursuant thereto. Accordingly,

IT IS HEREBY ORDERED AND ADJUDGED AS FOLLOWS:

(1) The Defendant Board's motion to dismiss be and same is DENIED.

(2) The Plaintiff First Bank's motion for summary judgment be and same is DENIED.

(3) The Defendant Board's motion for summary be and same is GRANTED.

(4) A judgment in conformity herewith shall this date be entered.